*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0352p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DIAPOLIS SMITH,

          *Petitioner-Appellant,*

    *v.*

MARY BERGHUIS, Warden,

          *Respondent-Appellee.*

No. 06-1463

>

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 03-00087—Gordon J. Quist, District Judge.

Argued: April 23, 2008

Decided and Filed: September 24, 2008

Before: MOORE and CLAY, Circuit Judges; SCHWARZER, Senior District Judge.[*]

---

## COUNSEL

**ARGUED:** James Sterling Lawrence, Royal Oak, Michigan, for Appellant. Debra M. Gagliardi, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** James Sterling Lawrence, Royal Oak, Michigan, for Appellant. Brian O. Neill, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

## OPINION

---

      CLAY, Circuit Judge. Petitioner, Diapolis Smith, was convicted of second degree murder and felony possession of a firearm and sentenced to life imprisonment in a Michigan state court. After exhausting his state court remedies, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Michigan, which was denied. Petitioner now appeals from the order entered by the district court denying his petition for a writ of habeas corpus. Specifically, Petitioner contends that he was denied an impartial jury drawn from a fair cross-section of the community in violation of the Sixth Amendment and that he received ineffective assistance of counsel at trial and during sentencing. We find that Petitioner has demonstrated a violation of his Sixth Amendment right to a jury drawn from a fair cross-section of the community and therefore we need not address his ineffective

---

[*] The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

assistance of counsel claims. For the reasons that follow, we **REVERSE** the judgment of the district court with respect to Petitioner's Sixth Amendment claim that his jury was not drawn from a fair cross-section of the community and **REMAND** the case with instructions that the district court order Smith's release from state custody unless the state of Michigan commences a new trial within 180 days of this order.

## BACKGROUND

The substantive facts giving rise to Petitioner Diapolis Smith's conviction were described by the Michigan Court of Appeals as follows:

> [Smith]'s conviction arises out of a shooting death at So-So's Lounge in Grand Rapids. Shortly before 1 a.m., the decedent quarreled with another male bar patron identified by some witnesses as [Smith] and by other witnesses as someone else. This quarrel soon escalated into a physical confrontation with both parties participating. The decedent was struck with a glass or beer bottle, hit on the head with a pistol butt, and kicked. As many as five other males joined in the fight and struck the decedent; several witnesses identified [Smith] as one of the men who joined the fight. Although several witnesses testified that [Smith] displayed a handgun during this confrontation, struck the decedent with the butt of the gun and fired between two and six shots, other witnesses testified that someone else fired the fatal shot. The fatal bullet pierced the decedent's chest, heart, pancreas and large intestine before exiting his back, causing him to bleed to death in three minutes. The bullet also pierced the thigh of a So-So's bouncer who was attempting to break up the fight.

*People v. Smith*, No. 172558, 1999 WL 33445050, at \*1 (Mich. Ct. App.1999).

On February 12, 1992, Petitioner was arrested and charged with one count of second-degree murder in violation of Mich. Comp. Laws § 750.317, two counts of possession of a firearm during commission of a felony in violation of Mich. Comp. Laws § 750.227b, and one count of assault with intent to commit great bodily harm less than murder in violation of Mich. Comp. Laws § 750.84.

Petitioner, who is African American, was tried by jury in Kent County Circuit Court. In 1990, the United States Census Bureau reported that 7.8 percent of the jury-eligible population in Kent County was African American and the overall percentage of African Americans in Grand Rapids, the largest city in the county, totaled 18.1 percent. Moreover, while Grand Rapids accounted for approximately 37 percent of the overall population of Kent County, it accounted for 85 percent of the African American population of the county.

Although the exact number is unclear, between 60 and 100 individuals constituted the venire panel for Petitioner's trial. At most, three of the prospective jurors were African American. Ultimately, 37 prospective jurors were examined by the parties during voir dire. Each of the 37 individuals examined by the parties was white. After the use of peremptory and for cause challenges by the parties, 14 individuals were seated as jurors in Petitioner's trial.

Prior to the jury being sworn, Petitioner challenged the composition of both the venire panel and the petit jury, alleging that African Americans had been improperly excluded. To remedy the underrepresentation of African Americans on the jury, Petitioner requested additional peremptory challenges. Moreover, Petitioner challenged the overall selection process for the venire panel as violative of his Sixth Amendment right to a jury drawn from a fair cross-section of the community. The trial court denied Petitioner's request, finding that "there's nothing to indicate to me that . . . the manner of selecting jurors is anything other than impartial and that there's been any type of subjective selection of jurors to create a problem in terms of representation." Thereafter, the trial court proceeded to empanel an all white jury.

After hearing all of the evidence, the jury convicted Petitioner of second degree murder and possession of a firearm during a felony. Petitioner, however, was acquitted of assault with intent to commit great bodily harm less than murder and the second count of possession of a firearm during the commission of a felony. *Smith*, 1999 WL 33335050, at *1. On November 29, 1993, the trial court conducted Petitioner's sentencing hearing. Thereafter, the trial court sentenced Petitioner to life imprisonment for the second degree murder conviction and a two year term of imprisonment for the felony-firearm conviction. *Id.* Petitioner's two year sentence was to be served consecutive to his sentence of life imprisonment. *Id.*

Petitioner appealed to the Michigan Court of Appeals, arguing a number of grounds for reversal, including the denial of an impartial jury drawn from a fair cross-section of the community in violation of the Sixth Amendment. *Id.* On May 14, 1997, the court of appeals remanded Petitioner's case to the trial court for an evidentiary hearing "to determine how jury venires were selected at the time of [Smith's] trial." *Id.* Pursuant to the remand from the state court of appeals, an evidentiary hearing took place on February 2, 1998 and April 27, 1998.

During the hearing, the trial court considered testimony from a number of witnesses regarding Kent County's jury selection process. Kim Foster, the Kent County Circuit Court Administrator, testified regarding the procedures utilized to constitute venire panels at the time of Petitioner's trial. Foster testified that "[p]ursuant to statute, our jury lists come from the driver's license lists and the Michigan identification cards issued by the Secretary of State." Foster testified that after he received the list from the Secretary of State, an estimation regarding the number of individuals that would be needed to populate juries was made with respect to the upcoming year.

Upon determining the anticipated number of jurors that would be needed by the County for the upcoming year, Kent County mailed a qualifying questionnaire to potential jurors. According to Foster, approximately 5 percent of the questionnaires mailed to prospective jurors were returned as undeliverable, while another 15 to 20 percent of the questionnaires were not returned. If a questionnaire was not returned, a letter was sent to the prospective juror outlining the penalties for the failure to respond, "as well as encouraging a response." Fifty percent of those who received the follow-up letter returned questionnaires. The remaining 50 percent who failed to return questionnaires were sent show cause orders, but no penalty followed for failure to respond. One Kent County study estimated that the areas with highest rates of non-response were those with large minority populations.

After the juror questionnaires were returned, the names of individuals who responded were placed on a qualified juror list. However, if a person who returned a questionnaire claimed a statutory exemption from jury service pursuant to Mich. Comp. Laws § 600.1307a[1], the individual's name was not placed on the qualified list. Based on the qualified juror list, a smaller group of potential jurors was selected at random and placed on the "second list." Individuals on the "second list" were sent notices to appear for jury duty. Foster also testified that a number of individuals who were placed on the qualified juror list could be excused from appearing for service based on non-

---

[1] Mich. Comp. Laws § 600.1307a provides, in pertinent part, that

(1) To qualify as a juror a person shall:(a) Be a citizen of the United States, 18 years of age or older, and a resident in the county for which the person is selected, and in the case of a district court in districts of the second and third class, be a resident of the district, and in the case of municipal courts of record, be a resident of the municipality.(b) Be conversant with the English language.(c) Be physically and mentally able to carry out the functions of a juror. Temporary inability shall not be considered a disqualification.(d) Not have served as a petit or grand juror in a court of record during the preceding 12 months.(e) Not be under sentence for a felony at the time of jury selection.(2) A person more than 70 years of age may claim exemption from jury service and shall be exempt upon making the request.

statutory excuses. For example, a prospective juror could be excused because of transportation problems, child care concerns, or the inability to take time away from work. Generally, such requests would be granted if requested, with no further proof regarding the excuse required by potential jurors or further consideration by county officials. Although Kent County tracked the names of individuals who were either placed on the list or individuals who were excused from service, the County did not record the race of the individuals being kept or excused.

Before October 1, 1993, jurors were first selected for the district courts located in the County and the remaining jurors were assigned to circuit courts. According to the testimony adduced at the evidentiary hearing, the Kent County Administrator's Office first assigned residents of Grand Rapids to juries for the 61st District Court, which is comprised of four district judges. Michigan law required that only residents of Grand Rapids could populate juries for 61st District Court. Residents of Grand Rapids would be assigned to Kent County Circuit Courts only after the 61st District Court had the requisite number of jurors.

Richard Hillary, director of the Kent County Public Defender's Office and Co-Chair of the Jury Minority Representation Committee of the Grand Rapids Bar Association , attested to the dearth of African Americans on Kent County juries. Hillary testified that "[b]ack prior to 1993, or even halfway through '93 and up to '94, I recall there being very few, if any, minorities, specifically black potential jurors at all." Hillary estimated that, in his experience trying felony cases in Circuit Court, "98 percent of the time we had all white juries."

As a result of the concerns regarding minority representation in the jury pool, the Grand Rapids Bar Association formed the Jury Minority Representation Committee. Hillary testified that the Committee was concerned about the impact that selecting district court jurors first was having on the make up of Circuit Court jury pools:

> [I]n the city areas which the District Courts encompass, are your highest percentage of minorities, and the concern was that we were pulling numbers for the District Court, the District Court would select first, and then not even return the unused ones to the Circuit Court panel. And we made a determination that we were losing minorities by choosing the District Court jurors first and not returning the unused ones to the . . . pool that the Circuit Court was taken from.

Foster testified that after October 1, 1993, Kent County reversed the order of juror assignment based on "the belief that the respective districts swallowed up most of the minority jurors, and circuit court was essentially left with whatever was left, which did not represent the entire county . . . ." Although changes were made to the order of juror assignments, nothing was done to correct the lack of minority representation on the qualified list to compensate for individuals who were disqualified based on prior felony offenses or those who were excused because they did not have a ride or could not afford a babysitter. However, Foster did testify that "now once a month – [non-statutory] excuses are dealt with once an individual is summonsed to jury duty for a given month. Generally, no further action is taken dealing with an excuse."

The trial court also heard testimony from Dr. Michael Stoline, a statistician, regarding the factors that contributed to minority underrepresentation on Kent County juries. Dr. Stoline estimated that between April of 1993 to October of 1993, the period which concerned Petitioner's trial, African Americans were underrepresented on Kent County venires by approximately 18 percent. In September of 1993, the month Petitioner's jury was selected, Stoline found the underrepresentation to be much higher at 34.8 percent. Based on this disparity, Dr. Stoline concluded that "blacks are underrepresented because of the way juror lists were drawn, using this sampling technique."

Dr. Stoline also testified that between October of 1993 and October of 1994, in ten out of the eleven months he examined, there was underrepresentation of census tracts with high black populations. Dr. Stoline estimated that there was a 15 percent underrepresentation of individuals from areas that had a high number of black residents. Dr. Stoline concluded that such disparities were larger than could be accounted for by mere chance.

Kurt Metzger, program director of the Michigan Metropolitan Information Center at Wayne State University, testified that the non-statutory excuses that enable individuals to be removed from the qualified list, such as childcare or transportation issues, disproportionately impact African American communities. Specifically, Metzger testified that 64 percent of African American households with children were headed by single parents, while only 19 percent of white families were headed by single parents. In Kent County, 27 percent of whites are renters, while 59 percent of African Americans are renters. Metzger also testified that 6.7 percent of whites live below the poverty line, while 31.5 percent of African Americans in Kent County live below the poverty line. Consequently, Metzger surmised that allowing individuals to opt out of jury service as a result of a non-statutory excuse removes the "randomness" from the jury pool selection process.

After hearing the testimony presented at the evidentiary hearing regarding Kent County's jury selection procedures, the trial court concluded that Petitioner had not been denied his right to an impartial jury drawn from a fair cross-section of the community. In particular, the trial court found that while Petitioner had demonstrated that African Americans were underrepresented in the jury pool, he did not demonstrate that African Americans were systematically excluded from the pool by the selection procedures employed by Kent County.

Petitioner once again appealed and the Michigan Court of Appeals reversed the decision of the trial court. *Smith*, 1999 WL 33445050, at * 5. The court of appeals found that the evidence adduced at the evidentiary hearing demonstrated that the underrepresentation of African Americans in the jury pool came as a result of systematic exclusion. "[T]he underrepresentation of minorities in the jury array available to defendant did not result from 'benign' random selection but instead resulted from a defect inherent in the juror allocation process that Kent County used under the pre-October 1993 system." *Id.* In particular, the court of appeals found that the assignment of prospective jurors from Grand Rapids to district courts in Grand Rapids prior to circuit courts resulted in the systematic exclusion of African Americans inasmuch as Grand Rapids accounted for the vast majority of the African American population in the county.

The Michigan Supreme Court, however, disagreed. The Michigan Supreme Court concluded that, even when giving Petitioner the benefit of the doubt with respect to his argument concerning the underrepresentation of African Americans in the jury pool, Petitioner did not show that African Americans were systematically excluded. *People v. Smith*, 615 N.W.2d 1, 4 (Mich. 2000). On remand, the Michigan Court of Appeals considered and rejected Petitioner's remaining claims and affirmed his convictions. *People v. Smith*, 2001 WL 721337, at *10 (Mich Ct. App. 2001).

Petitioner then instituted a petition for a writ of habeas corpus in federal district court pursuant to 28 U.S.C. § 2254, asserting 12 grounds for relief, including allegations that his jury was not drawn from a fair cross-section of the community and ineffective assistance of counsel. The district court denied Petitioner's petition for habeas corpus as well as Petitioner's application for a certificate of appealability. On July 11, 2007, however, this Court granted Petitioner a certificate of appealability with respect to two issues: (1) Petitioner's constitutional right to an impartial jury drawn from a fair cross-section of the community; and (2) ineffective assistance of counsel. Inasmuch as our disposition rests on Petitioner's Sixth Amendment claim, we do not reach the issues related to his ineffective assistance of counsel claims.

## DISCUSSION

### I. Standard of Review

"In a habeas corpus proceeding, this Court reviews a district court's legal conclusions *de novo* and its factual findings for clear error." *Miskel v. Karnes*, 397 F.3d 446, 451 (6th Cir. 2005). However, this Court's review of a state court determination is limited by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).

AEDPA prohibits a federal court from granting a writ of habeas corpus to a person incarcerated pursuant to a state court judgment with respect to a claim that was adjudicated on the merits in state court unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Because Petitioner filed his habeas petition after April 24, 1996, AEDPA governs this Court's review of his petition. *Williams v. Taylor*, 120 S.Ct. 1495, 1518 (2000).

A state court decision is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decision arrives at a conclusion opposite to that reached by [the Supreme Court] on a set of materially indistinguishable facts." *Williams*, 120 S.Ct. at 1523. However, as the Supreme Court noted in *Panetti v. Quarterman*, 127 S.C.t 2842 (2007), "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'" *Id*. at 2858 (quoting *Carey v. Musladin*, 127 S.Ct. 649, 656, (2006) (KENNEDY, J., concurring in judgment)). A state court determination is an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case." *Id*. However, simply because a "standard is stated in general terms does not mean [an] application w[ill be] reasonable. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Id*. Indeed, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.'" *Id*. (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

A state court decision may also be unreasonable where the state court extends a legal principle to an inapposite context or refuses to extend a principle to an analogous context. *Williams*, 120 S.Ct. at 1520. However, a federal habeas court may not reverse a state court decision on the grounds that it was unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly." *Id*. at 1522. Instead, a federal habeas court may reverse only where the state court's application of clearly established law is "objectively unreasonable." *Id*. at 1521.

When evaluating the propriety of a state court's application of a legal principle to the facts of a petitioner's case, this Court must presume the factual determinations made by the state court to be correct. 28 U.S.C. § 2554(e)(1). The presumption of correctness may be rebutted only upon a showing of clear and convincing evidence to the contrary. *Williams*, 120 S.Ct. at 1523.

**II.     Sixth Amendment Right to an Impartial Jury Drawn from a Fair Cross-Section of the Community**

Petitioner asserts that he was denied his Sixth Amendment right to a trial by an impartial jury drawn from a fair cross-section of the community.  Petitioner alleges that African Americans were underrepresented in the Kent County jury pool and that the particular procedures employed by Kent County in constituting its juror pool systematically produced such underrepresentation.  The Michigan Supreme Court's conclusion to the contrary, he argues, constitutes an unreasonable application of clearly established federal law as announced in *Taylor v. Louisiana*, 419 U.S. 522 (1975) and *Duren v. Missouri*, 439 U.S. 357 (1979).   For the reasons discussed below, we agree that the Michigan Supreme Court unreasonably applied federal law in rejecting Petitioner's Sixth Amendment challenge to the composition of his venire panel.

**A.     Clearly Established Right to Impartial Jury Drawn from a Fair Cross-Section of the Community**

Under the Sixth Amendment, a criminal defendant is entitled to a trial "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  In *Taylor v. Louisiana*, 419 U.S. 526 (1975), the Supreme Court held that the Sixth Amendment right to an impartial jury includes the right to a jury drawn from a fair cross-section of the community. *Id.* at 530.   The Court, however, "impose[d] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538. Instead, the Court held that defendants are entitled to a jury selection process that does "not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

In *Duren v. Missouri*, 439 U.S. 362 (1979), the Court clarified the rule announced in *Taylor*. There, the Court held that in order to establish a violation of the Sixth Amendment's fair cross-section requirement, a defendant must make a prima facie showing

> (1) that the group alleged to be excluded is a 'distinctive' group in the community;
> (2) that the representation of this group in venires from which juries are selected is
> not fair and reasonable in relation to the number of such persons in the community;
> and (3) that this underrepresentation is due to systematic exclusion of the group in
> the jury selection process.

*Id.* at 364. To meet this burden, a party need not show that the underrepresentation of a distinctive group came as a result of intentional discrimination. *Duren*, 439 U.S. at 368 n.26.  Rather, as other circuits have observed, "[u]nlike the equal protection challenge, the fair cross section claim does not require a showing that the selection procedure is susceptible [to] abuse or not race-neutral; the defendant must only show that the exclusion of his or her group is 'systematic.'" *United States v. Rodriguez-Lara*, 421 F.3d 932, 939 (9th Cir. 2005); *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).  Once the defendant has established a prima facie case, the burden then shifts to the government to show that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion of a distinctive group." *Duren*, 439 U.S. at 367-68.

Moreover, to prove a violation of the Sixth Amendment, a petitioner need not prove that the outcome of his or her particular trial would have been substantively different had the petit jury been drawn from a representative pool.  Rather, the Sixth Amendment's fair cross-section requirement is centrally concerned with insuring that the procedures employed by the state do not undermine the traditional role that juries play in our democracy and in our criminal justice system.   The representativeness of the jury, drawn from all strata of our diverse society, is what inspires

"confidence in the fairness of the criminal justice system." *Taylor*, 419 U.S. at 530; *cf. Powers v. Ohio*, 499 U.S. 400, 413 (1991) ("The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair."). Thus, the interference with the criminal defendant's ability or opportunity to draw a jury from a representative pool is the principal injury with which the Constitution is concerned.

The holdings of *Taylor* and *Duren*, however, were not meant to usurp the traditional role of the states in determining juror qualifications. Instead, "[t]he fair cross-section principle must have much leeway in application. The States must remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community." *Taylor*, 419 U.S. at 538.

**B.      Reasonableness of the Michigan Supreme Court's Application of the Clearly Established Right**

In addressing Petitioner's claim, the Michigan Supreme Court correctly identified the controlling standard as described in *Duren*. *See People v. Smith*, 615 N.W.2d 1, 2 (Mich. 2000). However, the Michigan Supreme Court unreasonably applied *Duren*'s three prong test in rejecting Petitioner's Sixth Amendment claim. As noted above, to satisfy the prima facie test established by *Duren*, a petitioner must show that a distinctive group was underrepresented in venire panels due to systematic exclusion within the jury selection process. Because it is clear that African Americans are a distinctive group, *see*, *e.g*., *Peters v. Kiff*, 407 U.S. 493, 503 (1972), we address only the second and third prong of the *Duren* prima facie test and the relevant Michigan state court findings.

### 1.      *Fair and Reasonable Representation*

The second prong of the *Duren* test requires Petitioner to demonstrate that the representation of African Americans on Kent County venire panels was not fair and reasonable. Before the Michigan Supreme Court, Petitioner offered proof that in the six months preceding his trial, African Americans were underrepresented by 18 percent and underrepresented by 34 percent in the month his jury was selected. Additionally, Petitioner argued that in ten of the eleven months following his trial, African Americans were underrepresented by at least 15 percent. However, after applying a number of different measures of underrepresentation, including absolute and comparative disparities, the Michigan Supreme Court rejected these disparities as constitutionally insignificant.

In *Duren*, the Supreme Court utilized the absolute disparity test to determine that women were underrepresented by 35 percent in venire panels in the Missouri district at issue. *Duren*, 439 U.S. at 365 n.23. The absolute disparity test compares the members of a distinctive group that are jury eligible with those that appear on the venire. However, in the years since *Duren*, the Court has not mandated that a particular method be used to measure underrepresentation in Sixth Amendment challenges. Consequently, courts across the country have utilized a number of methods, including absolute disparity and comparative disparity, to measure whether a distinctive group has been underrepresented on venire panels. *See United States v. Forest*, 355 F.3d 942, 954 (6th Cir. 2004) (absolute disparity); *United States v. Orange*, 447 F.3d 792, 798-99 (10th Cir. 2006) (absolute and comparative disparity).

Applying the absolute disparity measurement of underrepresentation to the instant case, the disparity between jury-eligible African Americans in the community and those who appeared on Kent County venires is negligible. Here, 7.28 percent of African Americans in Kent County were eligible for jury service. During the relevant time period for Petitioner's trial, 56 of the 929 individuals who appeared for venire panels in Kent County were African American. This represents

approximately six percent of the total pool of veniremen. Therefore, the absolute disparity between jury-eligible African Americans and those that actually appeared for venire panels was 1.28 percent.

Courts across the country have held that absolute disparities in this range are not constitutionally significant for purposes of *Duren*'s underrepresentation requirement. *See*, *e.g.*, *United States v. Booker*, No. 05-1929, 2007 WL 2492427, at * 2 (6th Cir. 2007) (finding absolute disparity of 2.6 percent constitutionally insignificant); *United States v. Rioux*, 97 F.3d 648, 658 (2d Cir. 1996) (finding absolute disparity of 2.68 percent a "constitutionally insignificant" disparity when examining Sixth Amendment challenge to composition of venire panel).[2] However, the wisdom of applying the absolute disparity test to measure the underrepresentation of the small African American population in Kent County is questionable. *See United States v. Jackman*, 46 F.3d 1240, 1247 (2d Cir. 1995) (finding the absolute disparities test to be inappropriate "when applied to an underrepresented group that is a small percentage of the total population . . . .").

As the Second Circuit noted in *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975):

> [A]n intractable use of the absolute measure may, in certain circumstances . . . produce distorted results. For example, if a district with 10% non-white population has .5% non-whites in the wheel, the 9.5% disparity may not evoke disapproval under an absolute measure but may require it under a comparative measure.

*Id.* at 835. Indeed, even if African Americans in Kent County were never called for jury service, the absolute disparity would still fall below the 10 percent figure that courts have found to be a threshold indicator of a constitutionally significant disparity.

Where the distinctive group alleged to have been underrepresented is small, as is the case here, the comparative disparity test is the more appropriate measure of underrepresentation. Indeed, "[w]hile . . . both [absolute and comparative disparity] provide a simplified statistical shorthand for a complex issue, the comparative disparity calculation provides a more meaningful measure of systematic impact vis-a-vis the 'distinctive' group," *United States v. Rogers*, 73 F.3d 774, 776 -77 (8th Cir. 1996), inasmuch as it "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur*, 983 F.2d at 1231-32.

In the instant case, African Americans were underrepresented on Kent County venire panels by 18 percent in the six months prior to Petitioner's trial as measured by comparative disparity. In the month during which Petitioner went to trial, this comparative disparity increased to 34 percent. In other words, the number of African Americans on Kent County venire panels was 18 and 34 percent lower than one would have expected based on random selection factors. These figures, which are larger than those revealed by the absolute disparity test, are sufficient to demonstrate that the representation of African American veniremen in Kent County at the time of Petitioner's trial was unfair and unreasonable. *United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) (finding comparative disparity of over 30 percent to meet the underrepresentation prong of the *Duren* prima facie test where African Americans comprised only 1.87 percent of the jury-eligible population); *Ramseur*, 983 F.2d at 1232 (finding comparative disparity of 40 percent of African Americans to

---

[2] *See also United States v. Quinones*, No. 93-10751, 1995 WL 29500, at *9 (9th Cir. 1995) (unpublished) (finding absolute disparity of 10.05 percent for Latinos on venire panels constitutionally permissible); *United States v. Suttiswad*, 696 F.2d 645, 648 (9th Cir. 1982) (7.7 percent absolute disparity for Hispanics, 4.7 percent for Asians, 2.8 percent for African Americans found to be constitutionally permissible); *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir. 1977) (2.9 percent for African Americans, 4.4 percent for males constitutionally permissible); *United States v. Armstrong*, 621 F.2d 951, 956 (9th Cir. 1980) (2.8 percent for African Americans constitutionally permissible).

be sufficient to establish underrepresentation of African Americans in jury pool).  Thus, Petitioner has established that African Americans were underrepresented on Kent County venire panels.

Resolving the question of underrepresentation on Kent County venire panels, however, does not resolve the question of whether Petitioner has met his burden under AEDPA.  To prevail under AEDPA, Petitioner must demonstrate not only that the Michigan Supreme Court was incorrect, but that its application of federal law was unreasonable.  The Michigan Supreme Court found that Petitioner's figures did not demonstrate that African Americans were significantly underrepresented on Kent County venire panels.  After a cursory discussion of the absolute and comparative disparity tests, the supreme court concluded that "defendant's statistical evidence failed to establish a legally significant disparity under either the absolute or comparative disparity tests." *Smith*, 615 N.W.2d at 3.  Other courts have reached the same conclusion when faced with such disparities. *See*, *e.g.*, *Johnson v. McCaughtry*, 92 F.3d 585, 594 (7th Cir. 1996) (comparative disparity of 33 percent insufficient to satisfy second prong of *Duren* prima facie case).

Because of the relatively small size of the African American population in Kent County, however, none of the applicable tests can appropriately measure the underrepresentation that occurred on Kent County venire panels.  Rather, as the concurrence in *Smith* noted, "because the jury-eligible black population of Kent County is small, and the sample of the overall population represented by the jury pool is also small, none of the analytical methods are particularly well-suited to defendant's case." 615 N.W.2d at 11 (Cavanagh, J., concurring).  In such cases, "[i]f a jury selection process appears ex ante likely to systematically exclude a distinctive group, that is, the system contains 'non-benign' factors, a court may essentially give a defendant the benefit of the doubt on underrepresentation, even if the system ex post proves to work no systematic exclusion." *Id.*  Other courts have similarly found significant underrepresentation in the context of small minority populations that would otherwise not satisfy the requisite burden under *Duren* where "non-benign factors" may be operating to produce such underrepresentation. *See United States v. Jackman*, 46 F.3d 1240, 1247-48 (2d Cir. 1995) (citing *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990)).  Thus, the Michigan Supreme Court properly examined *Duren*'s third prong given the significant risk of systematic exclusion of African Americans. However, for the reasons discussed below, we find that the Michigan Supreme Court unreasonably applied federal law in concluding that Kent County's jury selection process "work[ed] no systematic exclusion," *id.*, and that Petitioner therefore did not establish the prima facie case under *Duren*.

### 2.     *Systematic Exclusion*

To establish a prima facie case of a violation of the Sixth Amendment's right to a jury drawn from a fair cross-section of the community, Petitioner must demonstrate that African American underrepresentation occurred as a result of systematic exclusion from venire panels.  Under *Duren*, "disproportionate exclusion of a distinctive group from the venire need not be intentional to be unconstitutional, but it must be systematic." *Randolph v. People of the State of California,* 380 F.3d 1133, 1141 (9th Cir. 2004).  The Supreme Court has described "systematic exclusion" to mean exclusion "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366.

In his petition for writ of habeas corpus, Petitioner advances three arguments regarding systematic exclusion from Kent County venire panels.  First, Petitioner asserts that Kent County's practice of assigning jurors to district court panels prior to assigning jurors to circuit courts produced the underrepresentation of African Americans on Kent County circuit court venires.  Second, Petitioner argues that Kent County's practice of granting excused absences from jury duty for reasons such as lack of transportation or child care resulted in the disproportionate excusal or exclusion of African Americans from venire panels. Third, Petitioner attributes African American underrepresentation to Kent County's failure to send additional letters to areas with high concentrations of African Americans and nonresponders.

In examining Petitioner's contentions regarding the connection between the underrepresentation of African Americans and the jury selection procedures employed by Kent County, the Michigan Supreme Court found that:

> We further agree with our concurring colleague that defendant has not shown how the alleged siphoning of African-American jurors to district courts affected the circuit court jury pool. The record does not disclose whether the district court jury pools contained more, fewer, or approximately the same percentage of minority jurors as the circuit court jury pool. Defendant has simply failed to carry his burden of proof in this regard.
>
> We also agree with our concurring colleague that the influence of social and economic factors on juror participation does not demonstrate a systematic exclusion of African-Americans. The Sixth Amendment does not require Kent County to counteract these factors.
>
> Finally, even presuming that defendant can rely exclusively on statistics, he has not made the requisite showing in this case. In *Duren*, the Court noted that the defendant proved that a large discrepancy occurred in every weekly venire for approximately one year. Here, while defendant's proof may satisfy any duration requirement, the disparities over that time fell far short of those in *Duren* . . . .We therefore conclude that defendant has not shown a systematic exclusion of African-Americans for the Kent County Circuit Court jury pool.

*Smith*, 615 N.W.2d at 4.

We find that the Michigan Supreme Court unreasonably applied federal law when it held that the underrepresentation of African Americans did not occur as a result of systematic exclusion. In the instant case, Petitioner demonstrated that African Americans were underrepresented on Kent County venire panels by between 15 and 18 percent over a period of 17 months and 34 percent in the month during which his jury was drawn. While this disparity may not rise to the level of demonstrating systematic exclusion *per se*, this persistent disparity combined with Petitioner's evidence that this disparity was not random was sufficient to establish systematic exclusion within the meaning of *Duren*. *United States v. Rogers*, 73 F.3d 774, 777 (8th Cir. 1996) ("The extremely low probability that the underrepresentation would have occurred by chance alone provides further evidence that the system itself contributed to the lack of African-American participation in the venire pools."). Rather, for the reasons described below, Petitioner demonstrated that the underrepresentation of African Americans was "inherent in the particular jury-selection process utilized," and therefore met his burden to demonstrate that African Americans were systematically excluded from Kent County venire panels.

In the instant case, Kent County allowed prospective jurors to essentially "opt out" of jury service if jury duty would constitute a hardship based on child care concerns, transportation issues or the inability to take time from work. The evidence in the record suggests that the excuses allowed by Kent County with respect to child care and transportation disproportionately impacted African American prospective jurors.[3] In Kent County, for example, 64 percent of African American

---

[3] This case is distinguishable from other cases in which courts have held that permitting excuses from jury duty because of hardship did not constitute systematic exclusion. In such cases, the proof offered by the party challenging the venire suffered from infirmities, which are not present in the instant case, that undermined the strength of the inferences supporting a conclusion that the excuses were causing the underrepresentation of a distinctive group. *See*, *e.g.*, *McGinnis v. Johnson*, 181 F.3d 686, 690-91 (5th Cir. 1999) (finding excusal of three African American venire persons for personal reasons by trial court pursuant to Texas statute did not violate Sixth Amendment fair cross-section

households with children were headed by single parents, while only 19 percent of white families were headed by single parent households. Thus, allowing an excuse for the inability to find child care with no questions asked would likely disproportionately exclude African Americans from venire panels. Indeed, an expert testified that allowing individuals to opt out of jury service as a result of a non-statutory excuse removes the "randomness" from the jury pool selection process. The introduction of non-random factors into a jury selection process has been found to support an inference of systematic exclusion. *See*, *e.g.*, *United States v. Young*, 822 F.2d 1234, 1239 (2d Cir. 1987); *United States v. Osorio*, 801 F.Supp. 966, 978 (D. Conn. 1992). The lack of random selection in the Kent County jury selection process leads us to conclude that the underrepresentation of African Americans resulted from processes "inherent in the particular jury-selection process utilized." *Duren*, 439 U.S. at 366.[4]

The Michigan Supreme Court, however, rejected this evidence after finding that the Sixth Amendment is not concerned with the disparate impact of the non-statutory excuses because, in the supreme court's estimation, such disparities were rooted in "social and economic factors." Contrary to the conclusion reached by the Michigan Supreme Court, the Sixth Amendment is concerned with social or economic factors when the particular *system* of selecting jurors makes such factors relevant to who is placed on the qualifying list and who is ultimately called to or excused from service on a venire panel.[5] Indeed, "the disproportionate utilization of juror excuses by a given group may have clear importance where the Sixth Amendment's fair-cross section requirement is involved." *Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982) (citing *Duren*, 439 U.S. at 357). If, for example, a county created a juror exemption or an excuse for renters where 90 percent of African Americans in the county fell into that category, any resulting underrepresentation would clearly be "inherent in the system" inasmuch as the system made a socio-economic factor (i.e., renting) relevant to the makeup of the jury pool. Although certainly less drastic, the same principle applies in the instant case. Here, the particular jury selection process employed by Kent County made social or economic factors relevant to whether an otherwise qualified prospective juror would be excused from service; and because such social or economic factors disproportionately impact African Americans in Kent County, such factors produced systematic exclusion within the meaning of *Duren*

---

requirement because the petitioner offered evidence only of representation on his own venire panel); *Coleman v. McCormick*, 874 F.2d 1280, 1285 (9th Cir. 1989) (finding that excusing individuals on venire because of unavailability was not a systematic exclusion because petitioner "did not contend that the[] jurors [seated for his venire] were not representative of a fair cross-section of the community").

[4] The case relied upon by the Michigan Supreme Court for the proposition that the Sixth Amendment does not require jurisdictions to counteract "private sector influences" did not address particular criteria utilized as part of the construction of a qualified list of jurors or the excusal of individuals once placed on a qualified list. *See, e.g., United States v. Purdy*, 945 F.Supp. 1094, 1104 (D. Conn. 1996). In *Purdy*, the district court noted that jurisdictions were not obligated to counteract private sector influences such as rates of voter registration when individuals are drawn from lists of registered voters or the failure to return juror questionnaires. *Id.* ("Because the district does not have an obligation under the Sixth Amendment to affirmatively counteract 'private sector influences,' neither the failure to mail follow-up questionnaires to persons who did not respond to the May 1995 mailing nor the failure to follow Magistrate Margolis' recommendations for increasing minority participation constitute 'systematic exclusion.'").

[5] Courts, however, have been relatively uniform in finding that the failure to send additional letters to individuals who did not respond to questionnaires was not "systematic exclusion" within the meaning of *Duren*. In *United States v. Orange*, 447 F.3d 792, 800 (10th Cir. 2006), for example, the Tenth Circuit held that "[d]iscrepancies resulting from the private choices of potential jurors" with respect to the return of juror questionnaires, "do not represent the kind of constitutional infirmity contemplated by *Duren*." *See also Randolph v. People of the State of California*, 380 F.3d 1133, 1141 (9th Cir. 2004) (finding that failure to follow up with individuals who did not return juror questionnaires was insufficient to establish systemic exclusion of Latinos from venire panels); *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) (same). Thus, the Michigan Supreme Court's finding that African Americans were not systematically excluded by Kent County's failure to more aggressively pursue individuals who did not respond to juror questionnaires was not an unreasonable application of federal law.

inasmuch as they are "inherent in the particular jury selection process utilized." *Duren*, 439 U.S. at 366.

Moreover, those African Americans that actually appeared for jury duty were diverted away from circuit courts because of the priority given to the district court in Grand Rapids. Before October 1993, Kent County summoned individuals from the qualified list to appear for juries at district courts prior to assigning jurors for county circuit courts. As part of this priority assignment process, prospective jurors from Grand Rapids were solely designated for venire panels for the district court in Grand Rapids. It is undisputed in the record that Grand Rapids is the city with the largest African American population in the county. Indeed, although African Americans are approximately 18 percent of the total population of Grand Rapids, the African American population in Grand Rapids represents approximately 85 percent of the African American population in Kent County. Moreover, by statute, once an individual was assigned to a district court venire, he or she was not placed back on the qualified list for the circuit court because of a statutory exclusion for individuals who served on a jury in the previous twelve months. As a consequence of the assignment process, regardless of the number of African Americans assigned to district courts, fewer African Americans were available to serve as jurors for county circuit courts.

Indeed, the aforementioned statistics were confirmed by the testimony of two witnesses intimately familiar with the jury selection process in Kent County at the time Petitioner's jury was drawn. Richard Hillary, director of the Kent County Public Defender's Office and Co-Chair of the Jury Minority Representation Committee of the Grand Rapids Bar Association, testified that he routinely observed very few African Americans on Kent County venire panels. Hillary testified that the Jury Minority Representation Committee studied the phenomenon and determined "that we were losing minorities by choosing the District Court jurors first and not returning the unused ones to the . . . pool that the Circuit Court was taken from." Kim Foster, the Kent County Court Administrator, admitted as much during his testimony. During the evidentiary hearing, Foster stated that Kent County revised the juror assignment policy based on "the belief that the respective districts swallowed up most of the minority jurors, and circuit court was essentially left with whatever was left, which did not represent the entire county . . . ." We find that this evidence, combined with the duration of the underrepresentation of African Americans, demonstrates that such underrepresentation came as a consequence of a factor that was inherent in the jury assignment system.

On direct appeal, the Michigan Supreme Court found that Petitioner did not demonstrate systematic exclusion because he did not provide the precise number of jurors that were diverted from circuit courts. The systematic exclusion requirement as discussed in *Duren*, however, does not mean that a defendant's proof must be unequivocal, as the Michigan Supreme Court required, but instead, the proof must be sufficient to support an inference that a particular process results in the underrepresentation of a distinctive group. *Duren*, 439 U.S. at 363, 366-67; *Jackman*, 46 F.3d at 1248. In *Duren*, the Supreme Court considered whether a statute that provided an exemption for women from jury duty during the jury selection process violated the fair cross-section requirement of the Sixth Amendment. There, women were underrepresented on weekly venire panels over a one year period. Although women constituted 54 percent of the population, they were only 30 percent of the potential jurors who were summonsed and 14.5 percent of those who appeared for jury duty. Based on when the underrepresentation of women appeared in the jury selection process and the duration of the underrepresentation, the Court found that the exemption functioned to systematically exclude women. In so holding, the Court rejected a decision by the Missouri Supreme Court which found that no Sixth Amendment violation occurred because "petitioner had not unequivocally demonstrated the extent to which the low percentage of women was due to the automatic exemption for women, rather than to sex-neutral exemptions such as that for persons over age 65." *Duren*, 439 U.S. at 363. Thus, although there were other exemptions that could have affected the representation of women, the petitioner was not required to disprove the other exemptions as causes or to

demonstrate precisely the number of women electing to opt out of jury duty under the exemption. *Id.* at 366-67.

The exclusionary process that is inherent in the system of selecting prospective jurors need not be facially exclusionary or as stark as *Duren*, however, to raise an inference of systematic exclusion.[6]  In *Jackman*, 46 F.3d at 1248, for example, the Second Circuit found that the underrepresentation of African Americans and Latinos on venire panels was due to systematic exclusion where a computerized process that predominately generated the qualified juror list inadvertently omitted residents of two cities with the highest minority populations. There, the court considered a jury selection procedure adopted by county officials to correct a previous jury selection process that had been ruled unconstitutional because it excluded residents of two cities that accounted for "62.93% of the voting-age Black population and 68.09% of the voting-age Hispanic population in the division . . . ." *Id.*  Rather than discard the old list, the jury clerk for the county merely supplemented the list created under the unconstitutional system with names from the revised representative list on an as-needed basis.  For the venire panel challenged on appeal, for example, the jury clerk drew 84 percent of the names from the unconstitutional list (i.e., exclusionary list) and added only 16 percent of the names from a new (i.e., representative) list.  While the court did not have precise figures regarding the number of minorities excluded, the court nevertheless found that the underrepresentation of African Americans and Hispanics was "quite obviously due to the system by which juries were selected" because of the continued exclusion of a significant percentage of the minority population.  *Id.* at 1248 (quoting *Duren*, 439 U.S. at 367).

In the instant case, like *Duren* and *Jackman*, a substantial percentage of African Americans in Kent County were impacted by the jury excuse and the district court priority assignment processes.  Indeed, the comparison to *Jackman* is particularly apt with respect to the district court assignment plan.  Inasmuch as Grand Rapids represented 85 percent of the African American population in Kent County, the assignment of jurors away from circuit courts, even when they did not ultimately serve as petit jurors, essentially omits those residents from the available pool of circuit court juries.  Thus, taken together, Petitioner's proof with respect to the juror excuses and the diversion of jurors to the Grand Rapids district court under the pre-1993 assignment plan satisfies *Duren*'s third prong.  Given the small percentages of African American jurors and the impact that just one or two can have on the overall percentage of African Americans represented on venire panels,[7] we find that this evidence establishes that the underrepresentation of African Americans was caused by systematic exclusion inasmuch as this selection process resulted in fewer African Americans being eligible for service on circuit county juries.

The inference raised by Petitioner's proof is much stronger than in cases where we have rejected claims of systematic exclusion.  In *Ford v. Seabold*, 841 F.2d 677 (6th Cir. 1988), we held that "the selection of jurors from a neutral master list, without more, can[not] be construed as 'systematic exclusion' as defined in *Duren* merely because the percentage of women selected does not precisely mirror the percentage of women in the entire community."  In *United States v. Allen*,

---

[6] Indeed, the Michigan Court of Appeals has found a violation of the fair cross-section requirement under circumstances strikingly similar to the case at bar. In *People v. Hubbard*, 552 N.W.2d 493 (Mich. Ct. App. 1996), the Michigan Court of Appeals considered a Sixth Amendment challenge to a jury selection plan that operated in the same fashion as the plan in Kent County. In that case, Kalamazoo County assigned jurors to district courts prior to assigning jurors to venire panels for the circuit courts.  A study revealed that this practice resulted in 75 percent of African Americans being diverted to district courts. *Id.* at 500. After reviewing the selection process employed by Kalamazoo County, the *Hubbard* court found that the underrepresentation of African Americans on Kalamazoo County venires resulted from systemic exclusion. *Id.* at 504.

[7] For example, in October 1993, the month in which Petitioner's jury was drawn, there was a comparative disparity of 34 percent for African Americans on Kent County venire panels.  In raw numbers, this represents a disparity of approximately four African American jurors.

160 F.3d 1096, 1104 (6th Cir. 1998), we found that the defendants asserting that African Americans were systematically excluded because their venire panel was populated by persons previously stricken from other panels did not satisfy their burden because "they have neither asserted nor provided even a shred or evidence indicating that only whites are reassigned, while blacks are thrown back into the small wheel." Here, Petitioner has demonstrated "more" than the selection of jurors from a neutral master list, he has offered evidence sufficient to raise an inference that the particular processes used by Kent County in constituting its qualified and second lists systematically exclude African American jurors and thus has satisfied the third prong of the prima facie test.

Our conclusion that Petitioner has established a prima facie violation of the Sixth Amendment's fair cross-section requirement, however, does not end the inquiry. Once a party has met the prima facie test, the burden shifts to the state to demonstrate that "a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68.

The first aspect of the jury selection process that must be justified by Respondent is the excusals for economic hardship. In *Duren*, the Supreme Court anticipated that jury selection plans would preserve excuses from jury service based on economic or personal hardship. The *Duren* court noted, "it is unlikely that reasonable exemptions, such as those based on special hardship, incapacity, or community needs, 'would pose substantial threats that the remaining pool of jurors would not be representative of the community.'" *Duren*, 439 U.S. at 370 (quoting *Taylor*, 419 U.S. at 534). We find that the state has a significant interest avoiding undue burdens on individuals by allowing excuses based on the inability to obtain transportation and "in assuring that those members of the family responsible for the care of children are available to do so." *Id. See also Thiel v. Southern Pacific Co.*, 328 U.S. 217, 225 (1946) ("It is clear that a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship.").[8] Thus, Respondent has met her burden with respect to Kent County's excusal of prospective jurors citing hardships.

Respondent, however, has not demonstrated a significant interest in the assignment of Grand Rapids residents to the 61st District Court in Grand Rapids prior to assignment in Kent County circuit courts. Indeed, Kent County has eliminated the priority assignment policy based precisely on the grounds highlighted by Petitioner in this case. Therefore, Petitioner has demonstrated a violation of his Sixth Amendment right to a jury drawn from a fair cross-section of the community and the Michigan Supreme Court's conclusion to the contrary constitutes an unreasonable application of *Duren*.

## CONCLUSION

For the reasons stated above, we **REVERSE** the judgment of the district court with respect to Petitioner's Sixth Amendment claim that his jury was not drawn from a fair cross-section of the community and **REMAND** the case with instructions that the district court order Smith's release from state custody unless the state of Michigan commences a new trial within 180 days of this order.

---

[8] Our holding, however, is limited to cases where it can be shown that the excuses at issue here "are appropriately tailored to this interest[s]" presented by the state. *Id.* Where it can be shown that an excuse or exemption is unreasonable in relation to the significant interest of the state, a state may not meet its burden to demonstrate that "a significant state interest [is] manifestly and primarily advanced" by such excuses or exemptions.