[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15444

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2010
JOHN LEY
CLERK

D.C. Docket No. 04-00151-CV-WLS

WARREN LEE HILL, JR.,

Petitioner-Appellant,

versus

DERRICK SCHOFIELD,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(June 18, 2010)**

Before BARKETT, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Warren Lee Hill, Jr. appeals from the district court's denial of his 28 U.S.C. § 2254 habeas petition in which he challenged his death sentence. The district court granted a certificate of appealability on Hill's claim that the Georgia Supreme Court's decision upholding Georgia's statutory requirement that in order to be exempt from execution Hill must prove his mental retardation beyond any reasonable doubt is contrary to clearly established federal law as announced in Atkins v. Virginia, 536 U.S. 304 (2002). We conclude that because Georgia's requirement of proof beyond a reasonable doubt necessarily will result in the execution of the mentally retarded, the Georgia Supreme Court's decision is contrary to the clearly established rule of Atkins. The execution of the mentally retarded is prohibited by the Eighth Amendment's ban against cruel and unusual punishment. We therefore reverse and remand.

## I. Background

Hill was convicted and sentenced to death in 1991 for the murder of a fellow Georgia state prison inmate. His conviction and sentence were affirmed on direct appeal by the Georgia Supreme Court in 1993, Hill v. State, 427 S.E.2d 770 (Ga. 1993), and the United States Supreme Court denied certiorari, Hill v. Georgia, 510 U.S. 950, rehrg. denied Hill v. Georgia, 510 U.S. 1066 (1994).

Hill commenced state court habeas proceedings in 1994, during the course of

which he raised a claim that he was exempt from execution under Georgia law based on mental retardation.[1] Hill presented the state habeas court with several lay and expert witness affidavits, which the court found provided credible evidence of Hill's mental retardation. Accordingly, the state habeas court granted his writ for the limited purpose of conducting a jury trial on the issue of his mental retardation. Upon appeal by the State, the Georgia Supreme Court reversed and remanded the case, directing the state habeas court, without the intervention of a jury, to determine whether Hill had established his claim of mental retardation beyond a reasonable doubt. Turpin v. Hill, 498 S.E.2d 52 (Ga. 1998). Under Georgia law, a defendant who demonstrates that he has "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period" is deemed mentally retarded. Ga. Code Ann. § 17-7-131(a)(3). The defendant bears the burden of proving his mental retardation and "may be found 'guilty but mentally retarded' if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is mentally retarded." Id. § 17-7-131(c).

Upon remand, the state habeas court held an evidentiary hearing regarding

---

[1] Georgia has statutorily banned the execution of the mentally retarded since 1988. Ga. Code Ann. § 17-7-131(j).

3

the merits of Hill's claim that he is mentally retarded. The court issued its order on that claim, finding that under Georgia's substantive definition of mental retardation Hill had proved beyond a reasonable doubt that his IQ met the criterion for a diagnosis of mental retardation.[2] The court made an additional finding that Hill did not meet the exacting reasonable doubt standard regarding deficits in adaptive functioning.[3] The state habeas court therefore concluded that Hill could not prove his mental retardation under Georgia's stringent statutory standard, and thus, was not entitled to habeas relief on this ground.

While Hill's state habeas case was still pending, the United States Supreme Court decided Atkins, in which it held that the execution of mentally retarded offenders is categorically prohibited by the Eighth Amendment to the U.S. Constitution. 536 U.S. at 321. In light of this decision, Hill sought reconsideration on his mental retardation claim, specifically asserting that Georgia's standard requiring proof beyond a reasonable doubt for such claims was unconstitutional. The state habeas court agreed that the beyond a reasonable doubt standard placed an

---

[2] With regard to Hill's IQ, the court noted that "[a]ll quantitative I.Q. assessment results, except one, fall within the 'mild mental retardation' range especially when allowing for variance."

[3] Hill is not contesting Georgia's statutory definition of mental retardation which is in line with those definitions of the American Association on Mental Retardation (now the American Association on Intellectual and Developmental Disabilities) and American Psychiatric Association.

4

undue burden on Hill by creating "an extremely high likelihood of erroneously executing mentally retarded defendants by placing almost the entire risk of error upon the defendant." The court also commented that this high burden of proof is "unsuited" to the issue of mental retardation, especially because someone, like Hill, who is mentally retarded but in the lower range of that classification,[4] will be particularly susceptible to the risk of an erroneous determination that he is not mentally retarded. Thus, the court granted Hill's motion, finding that Hill was mentally retarded by a preponderance of the evidence and that Georgia's reasonable doubt standard was unconstitutional in light of Supreme Court precedent. The State appealed and the Georgia Supreme Court reversed, holding that, even under Atkins, Georgia's beyond a reasonable doubt standard of proof for a claim of mental retardation remains constitutionally permissible. Head v. Hill, 587 S.E.2d 613, 620-22 (Ga. 2003) (4-3 decision) (Sears, P.J., dissenting).

Hill then commenced the instant federal habeas proceeding, raising again the question of whether Georgia's requirement that mental retardation be proved beyond any reasonable doubt violates the dictates of Atkins. The district court denied the petition but granted Hill's request for a certificate of appealability on the

---

[4] Mental retardation includes four degrees of severity — mild, moderate, severe, and profound — based on an individual's level of intellectual impairment. See Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000); see also Atkins, 536 U.S. at 308 n.3.

mental retardation claim, which is now before us.

## II.  Standard of Review

Our review of Hill's federal habeas petition is governed by the standards set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  For any claim adjudicated on the merits in state court, § 2254(d) allows federal habeas relief only where the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Here, the Georgia Supreme Court's determination — that it is constitutionally permissible for Georgia to require an offender to prove mental retardation beyond a reasonable doubt  — involves a question of law, thus we must decide whether this decision is "contrary to" or an "unreasonable application" of federal law as determined by the Supreme Court.

A decision "contrary to" federal law contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts – in short, it is a decision "substantially different from the [Supreme Court's] relevant precedent . . . ."  Williams v. Taylor, 529 U.S. 362, 405 (2000).

6

A decision that unreasonably applies federal law identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, "unreasonably extends [the] principle . . . to a new context where it should not apply, or unreasonably refuses to extend [it] to a new context where it should apply." Williams v. Taylor, 529 U.S. 362, 407 (2000). Moreover, AEDPA does not "require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (quoting Carey v. Musladin, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment)).

## III. Discussion

In Atkins, the Supreme Court was presented with the question of whether the execution of mentally retarded offenders constitutes cruel and unusual punishment prohibited by the Eighth Amendment to the U.S. Constitution. 536 U.S. at 307. The Court unequivocally answered this question in the affirmative, explaining that the execution of the mentally retarded did not advance either of the penological purposes of the death penalty, i.e., retribution or deterrence, given the diminished cognitive and behavioral capacities of the mentally retarded that render them less culpable than the average offender. Id. at 318-20. Accordingly, it concluded that

7

the execution of mentally retarded offenders "is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Id. at 321 (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986)).  If an offender is mentally retarded, he may not be executed.[5]

Atkins did not define mental retardation, leaving it to the states to develop appropriate ways to prohibit the execution of the mentally retarded.  The Court did provide some guidance to the states regarding the definition of mental retardation by citing two clinical definitions of mental retardation that it noted were consistent with many state statutory definitions.  Atkins, 536 U.S. at 308 n.3, 317 n.22.  As noted, Georgia defines mental retardation consistent with those definitions as "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental

_____

[5] Contrary to the opinion expressed in the dissent, our conclusion that Atkins clearly establishes that a mentally retarded offender cannot be put to death is not in conflict with the United States Supreme Court's recent decisions in Renico v. Lett,  — U.S. —, 130 S. Ct. 1855 (2010), Thaler v. Haynes, — U.S. —, 130 S. Ct. 1171 (2010), or Berghuis v. Smith, — U.S. —, 130 S. Ct. 1382 (2010).  In those opinions, the Supreme Court did not alter the meaning of the term "clearly established," but merely applied the rule that "[a] legal principle is 'clearly established' within the meaning of [AEDPA] only when it is embodied in a holding of this Court." Thaler, 130 S. Ct. at 1173.  There can be no doubt that the holding of Atkins embodies the unambiguous principle that a mentally retarded capital defendant cannot be put to death.

Moreover, none of the three cases cited by the dissent addresses a situation such as the one we face here, where a state has utterly eviscerated a constitutionally granted right through severely limiting legislation.  We do not read too much into Atkins in finding that a state court decision is contrary to a clearly established holding of the United States Supreme Court when that state court decision so circumscribes the command of the Eighth Amendment as to effectively nullify that holding.

period." Ga. Code Ann. § 17-7-131(a)(3). Notably, however, Georgia is the only state to require proof of that status beyond a reasonable doubt.[6] Id. § 17-7-131(j).

In Hill's state habeas appeal, the Georgia Supreme Court correctly acknowledged that "Atkins announced a new federal constitutional prohibition against executing an entire class of persons," and that it "must determine whether, under the authority of federal constitutional law, the beyond a reasonable doubt standard continues to be an acceptable standard of proof to apply to mental retardation claims." Hill, 587 S.E.2d at 621. It pointed out that Atkins left to the states the task of developing ways to enforce the constitutional restriction on the execution of the mentally retarded. Id. It further noted that "nothing in Atkins instructs the states to apply any particular standard of proof to mental retardation claims." Id. The court then concluded that because Atkins recognized there may be dispute about who is and who is not mentally retarded, the Georgia legislature was "within constitutional bounds in establishing a procedure for considering alleged mental retardation that limits the exemption to those whose mental deficiencies are

---

[6] Of those states that impose the death penalty, twenty-two states require the offender to prove his mental retardation by a preponderance of the evidence (Alabama, Arkansas, California, Idaho, Indiana, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, Virginia, and Washington). Another four states — Arizona, Colorado, Florida, and Delaware — have adopted a clear and convincing standard. Three states, Connecticut, Kansas and Kentucky, and the federal government do not set a standard of proof. Georgia is the only state to require an offender to provide proof of mental retardation beyond a reasonable doubt.

9

significant enough to be provable beyond a reasonable doubt." Id. at 622 (emphasis added).[7]

The reasoning of the Georgia Supreme Court is contrary to the command of Atkins because the reasonable doubt standard, as applied to claims of mental retardation, necessarily will result in the deaths of mentally retarded individuals. In Atkins, the Court categorically prohibited the execution of mentally retarded offenders about whom there is a "national consensus" of lesser culpability. While it is true that Atkins left it to the states to develop ways to ensure that those mentally retarded offenders "about whom there is a national consensus" are not subject to capital punishment, 536 U.S. at 317, the Court did not give the states unfettered authority to develop procedures that nullify the Eighth Amendment's prohibition on the execution of the mentally retarded. Rather, the states were instructed to "develop[] appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." Id. (emphasis added) (quoting Ford v. Wainwright, 477

---

[7] As the dissent does now, the court in Hill relied on the United States Supreme Court's 1952 decision in Leland v. Oregon, 343 U.S. 790 (1952), in which the Court approved the beyond a reasonable doubt standard for claims of insanity at the time of the crime. The Georgia Supreme Court reasoned accordingly that this same standard was constitutionally permissible for mental retardation claims. But, Leland is not applicable under its own terms. Leland's holding was expressly premised on its acknowledgment that the case was not one in which the defendant "sought to enforce against the states a right which we have held to be secured to defendants in federal courts by the Bill of Rights." 343 U.S. at 798. Here, that is precisely what Hill seeks to do. And because Hill is seeking the protection of the Eighth Amendment, Leland is not applicable.

U.S. 399, 405 (1986)).  The discretion afforded the states, then, is not unbounded, and the means used to discriminate must be "appropriate."  Id.

Unquestionably, to define retardation as requiring an IQ of 30 or below would not be an "appropriate way" to enforce the command of Atkins.  By the same token, it would not be an "appropriate" means to impose a burden of proof that is so insuperably high that it inevitably excludes from Atkins' protection a substantial number of mentally retarded persons.  Yet, because of the highly subjective nature of the factual inquiry necessary to establish mental retardation, that is precisely what Georgia's once-pathbreaking statute effectively has done by requiring proof beyond a reasonable doubt.

Standards of proof often have powerful effects on the availability of a constitutional right.  In judicial proceedings, certainty of a fact beyond any doubt cannot often be established.  Nonetheless, disputed factual questions must be resolved.  As Justice Harlan explained in his concurring opinion in  In re Winship, "the factfinder cannot acquire unassailably accurate knowledge" of a given fact, but rather "can acquire . . . a belief of what probably happened."  397 U.S. 358, 370 (1970).  In this regard, "[t]he function of a standard of proof . . . is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'"

Addington v. Texas, 441 U.S. 418, 423 (1979) (quoting In re Winship, 397 U.S. at 370 (Harlan, J., concurring)).

Inherent in the premise that we cannot achieve absolute certainty of the truth of a particular fact, is the corollary that "the trier of fact will sometimes, despite his best efforts, be wrong in his factual conclusions." In re Winship, 397 U.S. at 370 (Harlan, J., concurring). In a criminal case an erroneous factual conclusion can result in the conviction of an innocent person or in the acquittal of a guilty one and the standard of proof that we apply will affect whether the risk of an erroneous conclusion will more often fall on the side of convicting an innocent person or releasing a guilty one. Id. at 371. Thus, depending on the relative importance of avoiding one false conclusion as opposed to the other, we decide how much risk of each of those wrong decisions we are willing to tolerate and who should bear that risk. For example, in those cases applying a preponderance of the evidence standard, we have decided that we are willing to tolerate a fair amount of risk of any wrong decision and that one party will bear a slightly higher amount of that risk than the other. As the Supreme Court has explained, "not only does the standard of proof reflect the importance of a particular adjudication, it also serves as a societal judgment about how the risk of error should be distributed between the litigants." Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 283 (1990) (internal quotation

and citations omitted).

Accordingly, when a procedural scheme requires one party to bear the burden of establishing a particular fact by the most stringent standard of proof that our legal system recognizes — beyond a reasonable doubt — it reflects society's desire that the party with the burden should bear the majority of the risk for an erroneous decision. For example, because individual liberty is extraordinarily valued, we place upon the government the burden of proving a defendant's guilt beyond a reasonable doubt. In re Winship, 397 U.S. at 363. "[T]he interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." Addington, 441 U.S. at 423 (emphasis added).

This standard is established to protect the defendant at the expense of the government. By choosing the highest standard of proof — guilt beyond a reasonable doubt — and placing the burden of proof on the government, we make it clear that we will tolerate almost no error with respect to the reliability of the evidence leading to the deprivation of one's liberty. This burden and standard of proof reflect society's belief that "it is far worse to convict an innocent man than to let a guilty man go free," In re Winship, 397 U.S. at 372 (Harlan, J., concurring). A

13

defendant's liberty interest is greater in our society than the interest of the

government in convicting and incarcerating guilty defendants.  As the Supreme

Court has noted:

> There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value – as a criminal defendant his liberty – this margin of error is reduced as to him by the process of placing on the other party the burden of . . . persuading the fact-finder at the conclusion of the trial of his guilt beyond a reasonable doubt.

Speiser v. Randall, 357 U.S. 513, 525-26 (1958).

In Atkins, the Court's paramount concern with regard to the states'

procedures was that they protect the constitutional right of the mentally retarded not

to be executed.  See Atkins, 536 U.S. at 317; see also Ford, 477 U.S. at 410

(recognizing that federal constitutional standards dictate the adequacy of a state's

chosen procedures to uphold a substantive constitutional right).  Yet, rather than

securing the constitutional right at issue here — protecting the mentally retarded

from execution — Georgia has done quite the opposite.  By imposing the

overwhelming majority of the risk of error on the defendant in its application of the

most stringent standard possible, Georgia holds that it is far better to erroneously

execute a mentally retarded person than to erroneously impose a life sentence on

one not mentally retarded.  Requiring a defendant to prove mental retardation

14

beyond a reasonable doubt is appropriate only if the interests of a state in maximizing the number of death sentences outweigh the constitutional right of mentally retarded offenders not to be executed. This state interest, however, is not constitutionally permissible at the cost of violating the constitutional right of a mentally retarded offender not to be executed.

Atkins's recognition of a national consensus against the execution of the mentally retarded teaches that the constitutional right of the mentally retarded not to be put to death far transcends the state's interest in carrying out a death punishment. Cf. Speiser, 357 U.S. at 525-26. A state's procedural safeguards must protect the offender's superior right by precluding, to the extent reasonably possible, an erroneous conclusion that an offender is not mentally retarded. See Gregg v. Georgia, 428 U.S. 153, 187 (1976) (plurality opinion) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed."); Woodson v. North Carolina 428 U.S. 280, 305 (1976) (plurality opinion) ("Because of th[e] qualitative difference [between life imprisonment and punishment by death], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." (internal citation omitted)). This is accomplished by reducing the margin of error as to the offender whose life interest in a constitutional right not to be executed is at

stake.  As Justice Harlan explained, "[b]ecause the standard of proof affects the

comparative frequency of . . . erroneous outcomes, the choice of the standard to be

applied in a particular kind of litigation should, in a rational world, reflect an

assessment of the comparative social disutility of each."  In re Winship, 397 U.S. at

371.  Atkins teaches us that there is a significantly greater "social disutility" in the

occurrence of an erroneous factual determination that an offender is not mentally

retarded.  Accordingly, it is not constitutionally permissible to expect an offender

who asserts mental retardation to bear the highest risk that our criminal justice

system can impose of the erroneous conclusion that he is not mentally retarded.[8]

_____

[8] The dissent points to a series of procedural rights that Georgia confers upon persons claiming mental retardation —  the right to argue their cause, to present evidence, and to cross-examine witnesses —  and says that these basic rights to be heard in an adversarial proceeding render Georgia's scheme constitutional.  In focusing on the defendant's right to process, however, the dissent is blinded to the profound and unconstitutional constriction wrought by Georgia's reasonable doubt standard upon the substantive right clearly recognized in Atkins.  No matter the degree of procedural due process with which the mentally retarded defendant is provided, the hard fact is that he will rarely, if ever, be able to overcome the immense hurdle of demonstrating what is nearly always a subjective medical diagnosis beyond a reasonable doubt.  No number of hearings or evidentiary opportunities can overcome the undeniable reality that mental retardation is not a matter that can usually be determined objectively and without powerful disagreement among experts.

The dissent also takes issue with the lack of empirical data in this record to support the fact that a reasonable doubt standard will too often preclude a finding of mental retardation where one is warranted.  Concededly, we are aware of no such empirical data, and we assume that such data would be exceedingly difficult to produce.  But such data are not required to prove the simple proposition of logic underlying our analysis.  If there is any area in our criminal justice system that demonstrates the absence of "unassailably accurate knowledge," In re Winship, 397 U.S. at 370, it is the area of mental retardation, which turns on a purely qualitative and inherently subjective assessment of "impairments in adaptive behavior . . . manifested during the developmental period."  Ga. Code Ann. § 17-7-131(a)(3).  Yet, the reasonable doubt standard denies Atkins relief whenever a fact-finder is unable to eliminate every "real

Indeed, as noted in Atkins, mentally retarded defendants are unable to contribute fully to their defenses, particularly having an under-developed conception of blameworthiness, a lack of knowledge of basic facts, and an increased susceptibility to the influence of authority figures.  536 U.S. at 318.  Thus, they are more likely to make false confessions, less likely to articulate and prove mitigation, less able to assist their attorneys, and more likely to make poor witnesses in their own defense.  Id. at 320-21.  Atkins specifically cautioned that these impairments "can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants."  Id. at 306-07.

Georgia's formulation of the reasonable doubt standard as a means of prohibiting the execution of only those offenders who evidence a severe enough degree of mental retardation fundamentally misapprehends the function of a high standard of proof.  Georgia views it as decreasing the risk of error that someone will

---

possibility" that the defendant is not retarded under this qualitative and subjective standard.  See Victor v. Nebraska, 511 U.S. 1, 27 (1994) (Ginsburg, J., concurring in part and concurring in the judgment) (quoting with approval Federal Judicial Center, Pattern Criminal Jury Instructions, at 17-18 (reasonable doubt instruction)).  That standard necessarily would result in the execution of some individuals, like the petitioner in this case, who are "more likely than not" retarded.  Indeed, even a petitioner who can prove retardation by clear and convincing evidence -- evidence that is "unequivocal . . . and convincing," California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater, 454 U.S. 90, 93 n.6 (1981) (quoting C. McCormick, Evidence § 320, at 679 (1954)), and sufficient to produce in the mind of the fact-finder "a firm conviction of the truth," United States v. Montague, 40 F.3d 1251, 1255 (D.C. Cir. 1994) -- could be executed under Georgia's regime.  The one certainty for mentally retarded petitioners, particularly those with mild mental retardation, is that it is exceedingly difficult to prove a subjective and qualitative test grounded in expert opinion beyond a reasonable doubt.

17

be erroneously deemed mentally retarded when it actually only allocates to the offender the majority of the risk that he will be erroneously deemed not mentally retarded. This conception of the reasonable doubt standard, by its very terms, ensures that some, if not many, mentally retarded offenders will be executed in violation of the Eighth Amendment.

Moreover, when one considers the highly subjective nature of the inquiry into mental retardation—an inquiry that is often rife with doubt—it becomes even clearer that the reasonable doubt standard unquestionably will result in the execution of those offenders that Atkins protects. Mental retardation is a medical condition that is diagnosed only through, among other things, a subjective standard that requires experts to interpret the meaning of behavior observed over an extended period of time. Moreover, the definition of mental retardation includes degrees of mental retardation that range from mild to profound,[9] and wherever an offender falls within that range, there is bound to be some disagreement between the experts about the meaning ascribable to the offender's conduct. Given the subjectivity that is necessarily involved in this medical diagnosis, which makes complete agreement among the experts a rarity, establishing mental retardation beyond a reasonable

---

[9] In discussing the definition of mental retardation, the Court in Atkins noted that "'mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." 536 U.S. at 309 n.3 (citation omitted).

18

doubt for all offenders within the entire range of this classification is rendered a virtual impossibility.

Indeed, a lack of uniformity in the opinions of the experts is exactly what characterized Hill's case, particularly in regard to the mental retardation criterion of deficits in adaptive skills functioning. At the evidentiary hearing in his state habeas case, Hill presented the testimony and written reports of several mental health experts who all agreed that he was mildly mentally retarded, whereas the state's experts concluded that he was not. Most of these experts met personally with and evaluated Hill and all reviewed essentially the same documentation in forming their opinions. Yet in analyzing all of the available information in regard to adaptive skills functioning, the experts differed in their opinions as to whether the data demonstrated impairments consistent with mental retardation. For example, Hill's expert, Dr. Toomer, testified that the affidavits from friends, teachers, and family regarding Hill's personal history, which described him as a loner, isolative and being unable to interact well with others in social situations, demonstrate a long-standing deficit in social interpersonal skills. The state's expert, Dr. Carter, however, concluded that this same background information, while being suggestive of Schizoid Personality Disorder, ultimately falls short of such a diagnosis. Given the disagreement of the experts about the meaning to attribute to Hill's behavior

19

during his developmental period, the court concluded that Hill had not demonstrated impairments in adaptive behavior beyond a reasonable doubt. However, the state habeas court did find that this evidence supported the conclusion that Hill was more likely than not mentally retarded.[10]

The Supreme Court has specifically cautioned about the use of a high burden of proof when a factual determination involves medical or psychiatric diagnoses:

> Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous. . . . The subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations. The reasonable-doubt standard of criminal law functions in its realm because there the standard is addressed to specific, knowable facts. Psychiatric diagnosis, in contrast, is to a large extent based on medical "impressions" drawn from subjective analysis and filtered through the experience of the diagnostician. This process often makes it very difficult for the expert physician to offer definite conclusions about any particular patient.

Addington, 441 U.S. at 429-30 (internal citations omitted).

---

[10] We mention these specific portions of the evidentiary record in Hill's case only to illustrate the highly subjective inquiry that must take place in diagnosing mental retardation. We note that the dissent makes numerous references to various pieces of the particular evidence that was presented to the state court regarding Hill's claim of mental retardation. However, the state of Georgia has explicitly stated that it is not challenging the state court's factual finding that Hill has established his mental retardation by a preponderance of the evidence. Moreover, we must accept the state court's factual finding that Hill has shown he is mentally retarded by a preponderance of the evidence. Thus, much of the dissent's discussion of the evidentiary record is not relevant to the only legal question that was before the Georgia Supreme Court and is the only legal question before us here.

20

That caution applies with special force in the context of determining mental retardation. The legal criteria for this condition are derived from the definitions developed by both the American Association on Mental Retardation (now the American Association on Intellectual and Developmental Disabilities) and the American Psychiatric Association. The inquiry into whether an individual has exhibited sufficient deficiencies in his adaptive skills — the second prong of the three-pronged inquiry into mental retardation — is so inherently subjective and readily unclear that most cases will result in differences of opinion and divergent conclusions among psychiatric experts. Under these circumstances, only those offenders who are so severely mentally retarded that they are wholly unable to perform the most basic of adaptive behaviors in the opinion of all experts will be able to meet Georgia's extraordinarily high burden. As such, Georgia's procedural regime effectively eviscerates the substance of what qualifies as mental retardation. The "range of mentally retarded offenders about whom there is a national consensus," Atkins, 536 U.S. at 317, includes the mildly to the profoundly mentally retarded, id. at 308-309 & n.3; see also Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000). Yet by limiting Atkins's protection to those offenders whose "mental deficiencies are significant enough to be provable beyond a reasonable doubt," Georgia has eviscerated the right announced in Atkins for all

21

mentally retarded offenders, and thereby essentially has eliminated that constitutional right in Georgia for many mentally retarded offenders.[11]

## IV. Conclusion

Atkins prohibits the execution of all mentally retarded defendants, not only the severe or profound mentally retarded, and it directs the states to create appropriate procedures that protect all of those individuals. The application of Georgia's reasonable doubt standard will necessarily result in the deaths of mentally retarded offenders by incorrect identification. Plainly, that standard is not an "appropriate way" to vindicate a mentally retarded offender's constitutional right not to be put to death. Applying the deference required under AEDPA, we hold that the conclusion reached by the Georgia Supreme Court —that the Eighth Amendment protects only those capital offenders whose retardation is "significant enough" to be proven beyond a reasonable doubt —eviscerates the command of the

---

[11] The dissent says that we have "require[d] a preponderance of the evidence standard for mental retardation claims because a more stringent standard 'necessarily will result in the deaths of mentally retarded individuals . . . .'" See Dissenting Opinion of Hull, J., post, at note 20. We have imposed no such requirement. All we have done is recognize (1) that Atkins prohibits the execution of mentally retarded persons as to whom there is a "national consensus" of unsuitability for punishment by death, (2) that this "consensus" plainly includes the spectrum of retardation from mild to profound, and (3) that the reasonable doubt standard ensures the execution of individuals who are nonetheless part of the national consensus. We need not and do not decide whether, for example, the clear and convincing evidence standard, or any other, would produce similarly unconstitutional results. We hold only that Georgia's requirement that a capital defendant must prove mental retardation beyond a reasonable doubt violates the command of Atkins.

22

Eighth Amendment that the mentally retarded shall not be executed, and is therefore "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States" in <u>Atkins</u>. 28 U.S.C. § 2254(d)(1). Accordingly, we reverse the district court's denial of Hill's petition for writ of habeas corpus and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

HULL, Circuit Judge, dissenting:

In 1988, well before Atkins[1] in 2002, the State of Georgia led the nation by abolishing the death penalty for mentally retarded defendants. See O.C.G.A. § 17-7-131 (prohibiting death penalty where defendant proves mental retardation beyond reasonable doubt). The national consensus against executing the mentally retarded that gave birth to the Atkins prohibition was a consensus that Georgia started. And Georgia led the way by the very same statute in the very same form – § 17-7-131(c)(3), (j) – that the majority opinion now claims violates Atkins by using a reasonable-doubt standard.

After Atkins, the Georgia Supreme Court held that the reasonable-doubt standard in § 17-7-131 comports with the Eighth and Fourteenth Amendments. Head v. Hill, 587 S.E.2d 613, 621-22 (Ga. 2003) ("Hill III"). In § 2254 cases, federal courts do not review state supreme courts' decisions de novo. Rather, Congress has restricted federal review to only whether the state supreme court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" as of the date of the state supreme court decision. Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2254(d)(1)

---

[1] Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002).

24

(emphasis added). Discussing § 2254(d)(1) specifically, and unanimously reversing two federal circuit courts for granting habeas relief, the Supreme Court has admonished: "A legal principle is 'clearly established' within the meaning of this provision only when it is embodied in a holding of this [Supreme] Court." Thaler v. Haynes, — U.S. —, 130 S. Ct. 1171, 1173 (2010) (emphasis added); see Berghuis v. Smith, — U.S. —, 130 S. Ct. 1382, 1392, 1395-96 (2010).

As the Georgia Supreme Court correctly noted, there is no holding in Atkins, or any other Supreme Court decision for that matter, invalidating a reasonable doubt standard for mental retardation claims. Just the opposite is true. Atkins expressly left it for the states to develop the procedural and substantive guides for determining who is mentally retarded. Bobby v. Bies, — U.S. —, 129 S. Ct. 2145, 2150 (2009). And in the 218-year history of our nation's Bill of Rights, no United States Supreme Court decision has ever suggested, much less held, that a burden of proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right.[2] Because there is no "clearly established" federal rule regarding the burden of proof for mental retardation claims, AEDPA mandates that this lower federal court leave the Georgia Supreme Court decision alone – even if

---

[2]The majority opinion, and Atkins, are not based on the Fourteenth Amendment's Due Process Clause and a defendant's procedural right to a fair trial, but only on the Eighth Amendment's cruel and unusual punishment prohibition.

25

we believe it incorrect or unwise – and affirm in this case.  I respectfully dissent

from the majority opinion's blatant refusal to follow the express requirements of

AEDPA.

## I.  BACKGROUND

It is important to the burden of proof issue that the whole story of this case be

told.  So I start at the beginning.

## A.    Mental Retardation and the Death Penalty

In 1988, long before Atkins in 2002, the Georgia General Assembly passed

the nation's first statute prohibiting the execution of mentally retarded persons.

Specifically, O.C.G.A. § 17-7-131(c)(3) and (j) state:

> [A criminal] defendant may be found "guilty but mentally retarded" if
> the jury, or court acting as trier of facts, finds beyond a reasonable
> doubt that the defendant is guilty of the crime charged and is mentally
> retarded.  If the court or jury should make such finding, it shall so
> specify in its verdict.
> . . .
> In the trial of any case in which the death penalty is sought which
> commences on or after July 1, 1988, should the judge find in accepting
> a plea of not guilty but mentally retarded or the jury or court find in its
> verdict that the defendant is guilty of the crime charged but mentally
> retarded, the death penalty shall not be imposed and the court shall
> sentence the defendant to imprisonment for life.

O.C.G.A. § 17-7-131(c)(3), (j) (emphasis added).

One year later, in Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934 (1989),

the United States Supreme Court concluded that the Eighth Amendment did not

26

prohibit the execution of the mentally retarded.[3]  The Supreme Court noted that, as

of that time, "[o]nly one State . . . currently bans execution of retarded persons who

have been found guilty of a capital offense."  Id. at 334, 109 S. Ct. at 2955 (citing

Georgia's O.C.G.A. § 17-7-131(j)).

That condition persisted until 2002, when the United States Supreme Court

overruled Penry in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), and

declared that the Eighth Amendment's "cruel and unusual punishment" provision

prohibited the execution of mentally retarded offenders.  Id. at 315-21, 122 S. Ct. at

2249-52.

Although the Supreme Court in Atkins recognized a national consensus

against executing mentally retarded persons, it said that there was a notable lack of

consensus on how to determine which offenders are mentally retarded:

> To the extent there is serious disagreement about the execution of
> mentally retarded offenders, it is in determining which offenders are in
> fact retarded. . . .   Not all people who claim to be mentally retarded
> will be so impaired as to fall within the range of mentally retarded
> offenders about whom there is a national consensus.

Atkins, 536 U.S. at 317, 122 S. Ct. at 2250.  The Supreme Court added that

---

[3]Shortly after the passage of O.C.G.A. § 17-7-131(c)(3) and (j), the Georgia Supreme Court upheld a state constitutional challenge to the death penalty as applied to mentally retarded defendants who were tried before the effective date of the statute.  Fleming v. Zant, 386 S.E.2d 339 (Ga. 1989), superseded in part by statute, Turpin v. Hill, 498 S.E.2d 52, 53-54 (Ga. 1998).  Thus, thirteen years before Atkins in 2002, the Georgia Supreme Court concluded that executing a mentally retarded defendant constitutes cruel and unusual punishment as defined in the Georgia Constitution.  Id. at 342.

27

although the states' "statutory definitions of mental retardation are not identical, [they] generally conform to the clinical definitions" established by the American Association on Mental Retardation ("AARM") and the American Psychiatric Association ("APA"). Atkins, 536 U.S. at 318 n.22, 122 S. Ct. at 2250 n.22.

In Atkins, the Supreme Court was careful not to fix the burden of proof or to impose rigid definitions of mental retardation. The Supreme Court left it to the states to develop "appropriate" procedures for mental-retardation determinations:

> As was our approach in Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences.

Id. (quotation marks and brackets omitted) (emphasis added). As the Georgia Supreme Court noted in this very case, the Supreme Court in Atkins "made clear that it was entrusting the states with the power to develop the procedures necessary to enforce the newly recognized federal constitutional ban." Hill III, 587 S.E.2d at 620 (citing Atkins, 536 U.S. at 317, 122 S. Ct. at 2250).

In Bobby v. Bies, – U.S. –, 129 S. Ct. 2145 (2009), the Supreme Court pointed out that Atkins "did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation 'will be so impaired as to fall [within Atkins' compass].'" 129 S. Ct. at 2150 (brackets in original). In its 2009 Bies decision, the Supreme Court repeated that Atkins had "left to the

28

States the task of developing appropriate ways to enforce the constitutional restriction" on executing the mentally retarded. Id. (brackets omitted).

I turn to how the Georgia reasonable-doubt statute and Atkins intersect with Hill's case.

**B.     Facts and Procedural History**

In 1990, Hill was serving a life sentence for the murder of his girlfriend. But he murdered another person in prison. Using a nail-studded board, Hill bludgeoned a fellow inmate, Joseph Handspike, to death in his bed. Several inmates and a guard witnessed the murder.

Even locked up in jail for one murder, Hill continued to kill. The jury unanimously convicted Hill of malice murder and unanimously imposed a death sentence. See Hill v. State, 427 S.E.2d 770, 774 (Ga. 1993) ("Hill I"). Despite the fact that O.C.G.A. § 17-7-131(c)(3) and (j) already exempted mentally retarded persons from execution at the time of Hill's trial, Hill did not assert at trial that he was mentally retarded. To the contrary, Hill called clinical psychologist William Dickinson, who testified that Hill was mentally slow (his IQ was 77), but not mentally retarded.

On direct appeal in 1993, the Georgia Supreme Court affirmed Hill's malice murder conviction and death sentence. Hill I, 427 S.E.2d at 772. On direct appeal,

29

Hill made no claim of mental retardation.

In 1994, Hill filed a state habeas petition. Again he made no mental retardation claim. But five years after trial, Hill amended his petition to allege, inter alia, that he is mentally retarded. In 1997, the state habeas court granted Hill a writ of habeas corpus for the limited purpose of conducting a jury trial on Hill's mental retardation claim, using a preponderance of the evidence standard.

The State appealed, and the Georgia Supreme Court reversed. Turpin v. Hill, 498 S.E.2d 52 (Ga. 1998) ("Hill II").[4] The Georgia Supreme Court concluded that § 17-7-131's requirement that a defendant prove his mental retardation beyond a reasonable doubt applies to all defendants tried after the statute's effective date in 1988. Id. at 53-54. The Georgia Supreme Court remanded Hill's case to the state habeas court to determine, without a jury, whether Hill could establish under the reasonable-doubt standard that he is mentally retarded. Id.

On remand, the state habeas court ordered mental evaluations, conducted an evidentiary hearing, and then denied all of Hill's claims. The order concluded that Hill had not proved he was mentally retarded under the reasonable-doubt standard.

_____

[4]The Georgia Supreme Court noted that (1) Hill was tried three years after the 1988 effective date of § 17-7-131(c)(3) and (j), and (2) Hill never alleged (either at trial in 1991 or on direct appeal in 1993) that he was mentally retarded. Hill II, 498 S.E.2d at 52. Therefore, Hill's claim was procedurally defaulted. Id. Nevertheless, the Georgia Supreme Court concluded that, to the extent that Hill's mental retardation claim challenged the imposition of the death penalty, it fell within Georgia's "miscarriage of justice" exception to its procedural default rules. Id. at 53.

The state habeas court employed the definition of mental retardation in O.C.G.A. §

17-7-131(a)(3), which provides that "mentally retarded" means (1) having

"significantly subaverage general intellectual functioning," (2) "resulting in or

associated with impairments in adaptive behavior," (3) "which manifested during

the developmental period."[5]

As to the first prong, the state habeas court found that Hill established beyond

a reasonable doubt his "significantly subaverage general intellectual functioning."[6]

As to the second prong, however, the state habeas court found Hill failed to

---

[5]All parties agree that Georgia's statutory definition of mental retardation is consistent with the AARM and APA clinical definitions of mental retardation quoted in Atkins. In Stripling v. State, 401 S.E.2d 500 (Ga. 1991), the Georgia Supreme Court stated that the "significantly subaverage general intellectual functioning" prong of the mental-retardation definition "is generally defined as an IQ of 70 or below," but that "an IQ test score of 70 or below is not conclusive" because "an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate." Id. at 504. Similarly, in Atkins, the Supreme Court noted that an IQ score between 70 and 75 "is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Atkins, 536 U.S. at 309 n.5, 122 S. Ct. at 2245 n.5.

[6]Before trial in 1991, clinical psychologist Dickinson evaluated Hill using the Weschsler Adult Intelligence Scale, Revised ("WAIS-R") test. Hill's full-scale IQ score on the WAIS-R was 77. Dickinson also administered to Hill in 1991 the Peabody Picture Vocabulary Test ("PPVT"), on which Hill earned an estimated IQ score of 74. Records show Hill took the PPVT when he was in second grade, and scored a 75.
      In 1997, in Hill's state habeas proceedings, Dr. Daniel Grant evaluated Hill using the Stanford-Binet Intelligence Test, and Hill received an IQ score of 72. In 2000, Dr. Jethro Toomer administered the Weschler Adult Intelligence Scale III ("WAIS-III") to Hill. Hill's full-scale IQ score on the WAIS-III was 69.
      Hill produced an affidavit from Dickinson in 2000 stating that his earlier finding of no mental retardation was erroneous because it was based on inadequate information, and his original IQ testing of Hill led to an inaccurate and misleading result. See Hill II, 498 S.E.2d at 52 n.1. In this affidavit, Dickinson opined that the 1991 WAIS-R overestimated Hill's IQ by 3-7 points.

31

show beyond a reasonable doubt that he had "impairments in adaptive behavior" such as "communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety." The state habeas court noted Hill's (1) extensive work history and "apparent ability to function well in such employment," (2) disciplined savings plans to purchase cars and motorcycles, (3) military service, (4) social life, (5) weak but sufficient writing skills, (6) ability to care for himself in home living except in periods of stress, and (7) health problems with seizures. The state habeas court did not discuss the third prong.

Hill moved the state habeas court to reconsider its denial in light of Atkins. Granting Hill's motion, the state habeas court concluded that a preponderance of the evidence standard should be applied to Hill's mental retardation claim. Although the state habeas court did not retreat from its earlier finding that Hill failed to show he was mentally retarded under the reasonable-doubt standard, the court stated it would find Hill to be mentally retarded under the preponderance of evidence standard.

The State appealed. In 2003 the Georgia Supreme Court again reversed the state habeas court. See Hill III, 587 S.E.2d at 618. Because the majority opinion does not fully discuss the Georgia Supreme Court's decision, I do. The Georgia

32

Supreme Court concluded: (1) Hill could have had a jury trial on mental retardation under O.C.G.A. § 17-7-131(c)(3) at the time of his original guilt trial in 1991 if he had asked for one, but he waived that right; (2) Hill was only entitled to have the state habeas court—not a jury—assess his mental retardation claim; (3) Atkins applied retroactively, but Atkins entrusted to the states the task of developing procedures to enforce the ban on executing the mentally retarded; (4) "nothing in Atkins instructs the states to apply any particular standard of proof to mental retardation claims"; and (5) the Supreme Court's decision in Leland v. Oregon, 343 U.S. 790, 72 S. Ct. 1002 (1952), which upheld as constitutional the reasonable-doubt standard for insanity claims, supported Georgia's reasonable-doubt standard in Hill's case. Hill III, 587 S.E.2d at 619-21.

The Georgia Supreme Court concluded that Georgia's reasonable-doubt standard was constitutionally acceptable for mental retardation claims. Id. The Georgia Supreme Court explained that O.C.G.A. § 17-7-131's reasonable-doubt standard reflected an acceptable state legislative choice to define as mentally retarded those defendants who are able to prove their mental retardation beyond a reasonable doubt:

> [A] higher standard of proof serves to enforce the General Assembly's chosen definition of what degree of impairment qualifies as mentally retarded under Georgia law for the purpose of fixing the appropriate criminal penalty that persons of varying mental impairment should

33

bear for their capital crimes . . . . [T]he Court in Atkins recognized that, despite a "national consensus" against executing mentally retarded persons, there might be "serious disagreement . . . in determining which offenders are in fact retarded." In view of the lack of national consensus as to which mentally impaired persons are constitutionally entitled to an exemption from death sentences, we conclude that the Georgia General Assembly . . . was originally and remains within constitutional bounds in establishing a procedure for considering alleged mental retardation that limits the exemption to those whose mental deficiencies are significant enough to be provable beyond a reasonable doubt.

Id. at 622 (citations omitted). It remanded Hill's case to the state habeas court for entry of an order denying Hill's state habeas petition. See id. at 618, 622-23. The state habeas court reinstated its earlier order finding Hill failed to prove mental retardation beyond a reasonable doubt.

In 2004, Hill filed a § 2254 petition, alleging that Georgia's reasonable-doubt standard for mental retardation violates the Eighth and Fourteenth Amendments. The district court denied relief. Hill appealed.

## II. STANDARD OF REVIEW

Hill's § 2254 petition and appeal are governed by AEDPA. Owen v. Sec'y, Dep't of Corr., 568 F.3d 894, 907 (11th Cir. 2009), cert. denied, 130 S. Ct. 1141 (2010). "Under AEDPA, our review of a final state habeas decision is 'greatly circumscribed and is highly deferential to the state courts.'" Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir. 2008) (quoting Crawford v. Head, 311 F.3d 1288, 1295

34

(11th Cir. 2002)). Under 28 U.S.C. § 2254(d)(1), as amended by AEDPA, a state prisoner cannot obtain federal habeas relief unless he can show the decision of the state court "was contrary to, or involved an unreasonable application of, <u>clearly established Federal law</u>, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1) (emphasis added). In this case, the only question is whether the Georgia Supreme Court's decision – that the reasonable doubt standard for mental retardation claims is constitutional – is "contrary to, or involved an unreasonable application of, clearly established Federal law." <u>Id.</u>[7]

As noted earlier, in two recent decisions, the Supreme Court unanimously reversed circuit appellate court decisions for not adhering to AEDPA's requirement that the federal legal principle be "clearly established" before lower federal courts, like us, can reverse a state supreme court decision and grant federal habeas relief. <u>Thaler</u>, 130 S. Ct. 1171 (2010); <u>Berghuis</u>, 130 S. Ct. 1382 (2010). The Supreme Court instructed: "A legal principle is 'clearly established' within the meaning of this provision <u>only when it is embodied in a holding of this Court.</u>" <u>Thaler</u>, 130 S. Ct. at 1173 (citing <u>Carey v. Musladin</u>, 549 U.S. 70, 74, 127 S. Ct. 649, 653 (2006); <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000)) (emphasis

---

[7]We generally review <u>de novo</u> the legal conclusions reached by the district court in denying Hill's § 2254 petition. <u>Owen</u>, 568 F.3d at 907. We review the district court's factual findings for clear error, and mixed questions of law and fact <u>de novo</u>. <u>Id.</u>

added); see also Owen, 568 F.3d at 907 ("'Clearly established Federal law' means the holdings, not the dicta, of the United States Supreme Court.").

In Thaler, the Supreme Court unanimously reversed the Fifth Circuit's decision, which had concluded that a state court judge in ruling on a Batson challenge must reject a demeanor-based explanation for a challenge unless that judge personally observed and recalls the aspect of the prospective juror's demeanor on which the explanation is based. Thaler, 130 S. Ct. at 1172. The Fifth Circuit concluded Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), and Snyder v. Louisiana, 552 U.S. 472, 128 S. Ct. 1203 (2008), "clearly established" that rule and thus reversed the Texas appellate court. Id. at 1173-74. In Snyder, the Supreme Court actually (1) did stress that when the explanation for a peremptory challenge "invoke[s] a juror's demeanor," the trial judge's "first hand observations" are of "great[] importance"; and (2) did point out that the peremptory challenge (based on nervousness) was not exercised until some time after the juror was questioned and the state trial judge might not have recalled the juror's demeanor. Snyder, 552 U.S. at 477, 479, 128 S. Ct. at 1208-09. Despite Batson and Snyder, the Supreme Court in Thaler concluded the Fifth Circuit "read far too much into those decisions" and "no decision of this Court clearly establishes the categorical rule on which the [Fifth Circuit] Court of Appeals appears to have relied." Thaler,

36

130 S. Ct. at 1172, 1175.

A month later, in Berghuis v. Smith, the Supreme Court unanimously reversed the Sixth Circuit's decision, which had concluded that in determining whether a jury venire was drawn from a fair cross-section of the community, "courts should use the comparative disparity test to measure underrepresentation" where the allegedly excluded group is small, and the defendant's comparative disparity statistics demonstrated that African-Americans' representation in the County Circuit Court venires "was unfair and unreasonable." Berghuis, 130 S. Ct. at 1391 (citing Smith v. Berghuis, 543 F.3d 326, 338 (6th Cir. 2008)). In granting federal habeas relief and effectively reversing the Michigan Supreme Court's denial of habeas relief, the Sixth Circuit relied on Duren v. Missouri, 439 U.S. 357, 99 S. Ct. 664 (1979).[8]

Reversing the Sixth Circuit, the United States Supreme Court stated, "[O]ur Duren decision hardly establishes – no less 'clearly' so – that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the

---

[8]The Supreme Court in Duren set forth the following showing required for a prima facie claim that a petit jury was not drawn from a fair cross section of the community:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren, 439 U.S. at 364, 99 S. Ct. at 668.

community." Berghuis, 130 S. Ct. at 1392. The Supreme Court added: "[N]either Duren nor any other decision of this Court specifies a method or test courts must use to measure the representation of distinctive groups in jury pools." Id. at 1393.[9]

These two § 2254(d)(1) habeas decisions re-emphasize that petitioner Hill must show a "clearly established" federal law in the form of a United States Supreme Court holding before this lower federal court can overturn a Georgia Supreme Court decision.[10]

### III. DISCUSSION

Although Hill had a right under § 17-7-131(j), well before Atkins, to claim that he was mentally retarded, Hill did not claim mental retardation at trial, on direct appeal, or in his original state habeas petition. Rather, five years after trial, Hill amended his state habeas petition to claim mental retardation. The state habeas court found Hill has not shown he is mentally retarded beyond a reasonable doubt, and Hill does not challenge that finding.

---

[9]See also Renico v. Lett, — U.S. —, 130 S. Ct. 1855, 1860, 1862-66 (2010) (reversing the Sixth Circuit's grant of federal habeas relief to Michigan prisoner because Sixth Circuit failed to grant Michigan Supreme Court's decision appropriate deference required by AEDPA).

[10]Like the Fifth Circuit and Sixth Circuit decisions the Supreme Court reversed in Thaler and Berghuis, respectively, the majority opinion quotes the governing AEDPA standard, which prohibits the grant of habeas relief unless the state supreme court decision is contrary to, or an unreasonable application of, "clearly established" federal law. See Haynes v. Quarterman, 561 F.3d 535, 538 (5th Cir. 2009); Smith v. Berghuis, 543 F.3d 326, 334-35 (6th Cir. 2008). The majority opinion then wholly ignores that AEDPA standard, especially the fact that "clearly established" federal law must be embodied in prior United States Supreme Court holdings.

The majority opinion contends only that the Georgia Supreme Court's decision upholding Georgia's statutory reasonable-doubt standard is contrary to the United States Supreme Court's Atkins decision. The majority's position is that Georgia's statute (which was at the vanguard of the "national consensus" leading the Supreme Court to abolish the execution of the mentally retarded in Atkins) is now unconstitutional under the authority of Atkins—even though Atkins does not require any fixed burden of proof, and leaves that procedural decision to the states. For several reasons, the majority opinion "read[s] far too much into" Atkins, and no decision of the Supreme Court establishes the burden-of-proof rule in mental retardation cases on which the majority relies. Thaler, 130 S. Ct. at 1172.

## A.   Atkins Left Procedural Rules to States

First, the Supreme Court in Atkins made no reference to, much less a holding on, the burden of proof. See Thaler, 130 S. Ct. at 1173; Owen, 568 F.3d at 907. To the contrary, the Supreme Court in Atkins noted the lack of agreement as to how mental retardation is to be determined, and expressly left the procedures for doing so to the states.[11] 536 U.S. at 317; 122 S. Ct. at 2250; see also Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir. 2009) ("[T]he [Supreme] Court left to the states the

---

[11]Moreover, the Atkins Court cited the Georgia statute at issue here – O.C.G.A. § 17-7-131, which then, as now, required mental retardation to be proven beyond a reasonable doubt – without criticism. Atkins, 536 U.S. at 313-14 & n.9, 122 S. Ct. at 2248 & n.9.

development of standards for determining when an offender is mentally retarded.").

Therefore, Atkins provides no support for Hill's or the majority opinion's

argument.

Atkins's decision to leave the task to the states not only renders the federal

law not "clearly established," but also makes it "wholly inappropriate for this court,

by judicial fiat, to tell the States how to conduct an inquiry into a defendant's

mental retardation." In re Johnson, 334 F.3d 403, 405 (5th Cir. 2003) (noting that

Atkins explicitly left the procedures governing its implementation to the states).[12]

In Bies, the Supreme Court in 2009 reaffirmed that "[its] opinion [in Atkins]

did not provide definitive procedural or substantive guides for determining when a

person who claims mental retardation 'will be so impaired as to fall [within Atkins'

compass.]'" Bies, 129 S. Ct. at 2150.  Bies made it clear that Atkins did not set forth

procedural guidelines as to the burden of proof.  Bies even repeated that Atkins "left

to the States the task of developing appropriate ways to enforce the constitutional

---

[12]The state supreme courts are split on the burden of proof issue in mental retardation cases.  See, e.g., State v. Grell, 135 P.3d 696, 705 (Ariz. 2006) (finding clear and convincing evidence standard for mental retardation claims is constitutional); People v. Vasquez, 84 P.3d 1019, 1023 (Colo. 2004) (stating that "the substantive restriction of Atkins" does not limit Colorado's "discretion in allocating and quantifying the appropriate burden of proof"); Hill III, 587 S.E.2d at 621-22; but see Pruitt v. State, 834 N.E. 2d 90, 103 (Ind. 2005) (invalidating clear and convincing evidence scheme for mental retardation claims based not on clearly established Supreme Court holdings but on the "implication" of Atkins); State v. Williams, 831 So. 2d 835, 860 (La. 2002) (stating decision to invalidate clear and convincing evidence requirement was one made in "the absence of any guidance from the Supreme Court").  State supreme courts are not constrained by AEDPA like federal circuit courts are.

restriction."  Id.[13]

By this I do not mean to imply for a moment that the Supreme Court in

Atkins concluded that the Constitution places no substantive restrictions upon

procedures a state may employ in determining mental retardation; it simply did not

consider or reach the burden-of-proof issue, and neither has any subsequent

Supreme Court opinion.  Nor do I gainsay the possibility that the Supreme Court

may later determine that a reasonable-doubt standard for establishing the mental

retardation exception to execution is constitutionally impermissible.  But under

AEDPA, we are not concerned with what a United States Supreme Court holding

could or should be in the future, but only what it was as of the time of the Georgia

Supreme Court's decision in Hill III in 2003.

## B.     Beyond-a-Reasonable-Doubt Standard Upheld for Insanity Defense

Second, in the absence of any Supreme Court burden-of-proof holding in

mental retardation execution cases, the Georgia Supreme Court looked to the

Supreme Court's insanity decisions in Leland v. Oregon, 343 U.S. 790, 72 S. Ct.

1002 (1952) (rejecting due process challenge to reasonable doubt standard for

---

[13]It is therefore hardly surprising that in three of Georgia's post-Atkins death penalty cases, Schofield v. Holsey, 642 S.E.2d 56 (Ga.), cert. denied, 128 S. Ct. 728 (2007); Head v. Stripling, 590 S.E.2d 122 (Ga. 2003), cert. denied, 541 U.S. 1070 (2004); King v. State, 539 S.E.2d 783 (Ga. 2000), cert. denied, 536 U.S. 982 (2002), the Supreme Court denied capital defendants' certiorari petitions that made the same constitutional reasonable-doubt challenge that Hill makes here.  If anything, this demonstrates that Atkins did not establish—let alone "clearly establish"—that Georgia's reasonable-doubt standard is unconstitutional.

41

establishing insanity plea), and <u>Ford v. Wainwright</u>, 477 U.S. 399, 106 S. Ct. 2595 (1986) (recognizing Eighth Amendment prohibits execution of insane persons and allowing states to decide ways to enforce that constitutional restriction). The Georgia Supreme Court determined, <u>inter alia</u>, that "a mental retardation claim is comparable to a claim of insanity" in that "both relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject." <u>Hill III</u>, 587 S.E.2d at 621. Both <u>Leland</u> and <u>Ford</u> support the Georgia Supreme Court's decision.[14]

At the time of <u>Leland</u>, Oregon was the only state that required a defendant to establish a plea of insanity beyond a reasonable doubt. Nonetheless, in <u>Leland</u> the Supreme Court determined that that fact was not dispositive and that Oregon's reasonable-doubt standard for insanity pleas was constitutional, stating:

> Today, Oregon is the only state that requires the accused, on a plea of insanity, to establish that defense beyond a reasonable doubt. Some twenty states, however, place the burden on the accused to establish his insanity by a preponderance of the evidence or some similar measure of persuasion. While there is an evident distinction between these two rules as to the quantum of proof required, <u>we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here. Oregon merely requires a heavier</u>

---

[14]The majority opinion here improperly dismisses <u>Leland</u> in a footnote and never discusses <u>Ford</u>. The majority opinion also fails to acknowledge that <u>Ford</u> involved the Eighth Amendment right of a defendant not to be executed if insane and in <u>Ford</u> the Supreme Court left <u>Leland</u>'s reasonable-doubt standard fully intact even though it recognized an insane defendant had an Eighth Amendment right not to be executed.

> burden of proof. . . . The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.

Leland, 343 U.S. at 798, 72 S. Ct. at 1007 (footnote, quotation marks, and citation omitted) (emphasis added).[15] The Leland Court noted that a defense of insanity lessened one's culpability, which is the same basis used for Eighth Amendment protection in Atkins.[16] Id. at 796-97, 72 S. Ct. at 1006-07.

And further, in Ford, as in Atkins, the Supreme Court refused to impose any particular burden of proof on the right of the insane not to be executed and left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 477 U.S. at 416-17, 106 S. Ct. at 2605 (plurality opinion). In Ford, a majority of the Supreme Court first held that the Eighth Amendment prohibited execution of insane persons. Then, in a portion of the lead opinion garnering plurality support, the Supreme Court stated that "[i]t

---

[15]The Supreme Court in Leland also stated, "We are . . . reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice." Id. at 799, 72 S. Ct. at 1007-08.

[16]See Atkins, 536 U.S. at 316, 318, 122 S. Ct. at 2249, 2250-51 (stating, "our society views mentally retarded offenders as categorically less culpable than the average criminal," and "[t]heir deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability").

may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of non-meritorious or repetitive claims of insanity." Id. at 417, 106 S. Ct. at 2605 (emphasis added).[17]

## C.    Hill's Cooper Argument

Hill relies on Cooper v. Oklahoma, 517 U.S. 348, 116 S. Ct. 1373 (1996), which held that an Oklahoma law – requiring a defendant to prove incompetence to stand trial by clear and convincing evidence – violated the Due Process Clause. Id. at 366-69, 116 S. Ct. at 1383-84. The Georgia Supreme Court concluded that the insanity cases of Leland and Ford are more comparable to mental retardation than is the incompetency issue in Cooper. See Hill III, 587 S.E.2d at 621-22.

First, Cooper emphasized that (1) the Supreme Court had historically and consistently recognized that "the criminal trial of an incompetent defendant violates

---

[17]The plurality opinion in Ford discussed the procedures by which a state will determine insanity-based exclusion from execution under the Eighth Amendment:

> [W]e must conclude that the State's procedures for determining sanity are inadequate to preclude federal redetermination of the constitutional issue. We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences. It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity. Other legitimate pragmatic considerations may also supply the boundaries of the procedural safeguards that feasibly can be provided.

Id. at 416-17, 106 S. Ct. at 2605 (footnote and citation omitted). The plurality opinion noted that Florida's procedure was deficient for not furnishing the procedural safeguards of: an opportunity for the prisoner to submit evidence, an opportunity for the prisoner to impeach or challenge the opinions of the state-appointed mental health experts, and placement of factfinding authority in the hands of a neutral party. Id. at 413-16, 106 S. Ct. at 2603-05.

44

due process"; and (2) the historical common-law standard of proof for incompetency in both English and American cases was preponderance of the evidence. Cooper, 517 U.S. at 354-56, 116 S. Ct. at 1376-77. In contrast, there is no historical Eighth Amendment right of a mentally retarded person not to be executed. And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right. As recently as 1989, Penry refused to bar the execution of the mentally retarded. Even Atkins was based not on historical tradition or the Due Process Clause, but on the contemporary national consensus that reflected "the evolving standards of decency" that informed the meaning of the Eighth Amendment. Atkins, 536 U.S. at 311-12, 122 S. Ct. at 2247.

Indeed, Georgia's reasonable doubt standard for establishing a mental retardation exception to the death penalty, at twenty-two years old, is the oldest such law in the nation. Although other states recently have employed either clear-and-convincing-evidence or preponderance-of-evidence standards, no more lenient standard of proof predates Georgia's. Thus, Cooper's due process analysis does not help Hill.

**D.     Majority Opinion's "Evisceration" Argument**

The core of the majority opinion's argument is only that (1) Atkins prohibits the execution of mentally retarded persons, (2) a person who meets the

preponderance of the evidence standard is more likely than not mentally retarded, and (3) thus Georgia's reasonable-doubt procedural rule substantially burdens and "effectively eviscerates" the Eighth Amendment substantive right of the mentally retarded not to be executed.

As noted earlier, in the 218-year history of our nation's Bill of Rights, no Supreme Court decision has ever held, or even implied, that a burden-of-proof standard on its own can so wholly burden an Eighth Amendment right as to eviscerate or deny that right. Because there is no "clearly established" federal law supporting Hill's position, AEDPA mandates that we leave alone the Georgia Supreme Court's denial of Hill's constitutional challenge to Georgia's statutory reasonable-doubt standard.[18] See Berghuis, 130 S. Ct. at 1391-92; Thaler, 130 S. Ct. at 1173.

Even Atkins itself does not support the majority opinion's argument. Atkins did not bestow a substantive Eighth Amendment right on a fixed and rigid

---

[18]Two very experienced district court judges in our circuit have examined the Georgia statute and similarly failed to see a "clearly established" right to a more lenient burden of proof in the mental retardation context. See Ledford v. Head, No. 1:02-CV-1515-JEC, 2008 WL 754486, at *3 n.6 (N.D. Ga. Mar. 19, 2008) (Carnes, J.) ("There is no language in Atkins to suggest that Georgia's standard is constitutionally impermissible. In fact, the Supreme Court cited Georgia's statute with approval."); Ferrell v. Head, 398 F. Supp. 2d 1273, 1295 (N.D. Ga. 2005) (Thrash, J.) ("Atkins makes it abundantly clear that each state is permitted to design its own system for determining mental retardation, insofar as such system does not wholly erode the constitutional prohibition against execution of the mentally retarded. The Petitioner fails to persuade this Court that Georgia's statute so erodes this prohibition.").

46

definition of "mentally retarded persons." The Supreme Court in Atkins stressed that "there is serious disagreement" in how to determine who is mentally retarded and "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Atkins, 536 U.S. at 317, 122 S. Ct. at 2250. Indeed, various states use different definitions of intellectual functioning (some draw the line at an IQ of 75 or below, some at 70 or below, others at 65 or below)[19] and different factors in assessing adaptive functioning. And states use different procedures for determining who is actually mentally retarded. Atkins expressly left to the states "the task of developing appropriate ways to enforce the constitutional restriction" regarding

---

[19]See, e.g., Ariz. Rev. Stat. Ann. § 13-753 (establishing procedure by which defendants in capital cases are pre-screened by psychological expert who administers IQ test; those with scores below 76 are tested further by mental retardation experts, and if the defendant then scores 70 or below on any IQ test, the court conducts a hearing at which the defendant must prove mental retardation by clear and convincing evidence; a "determination by the trial court that the defendant's intelligence quotient is sixty-five or lower establishes a rebuttable presumption that the defendant has mental retardation," but "a defendant with an intelligence quotient of seventy or below" can still prove mental retardation by the clear and convincing evidence standard); Ark. Code Ann. § 5-4-618(a)(2) ("There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below."); 725 Ill. Comp. Stat. § 5/114-15(d) ("An intelligence quotient (IQ) of 75 or below is presumptive evidence of mental retardation."); Ky. Rev. Stat. Ann. § 532.130 ("'Significantly subaverage general intellectual functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below."); Neb. Rev. Stat. § 28-105.01(3) ("An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation."); S.D. Codified Laws § 23A-27A-26.2 ("An intelligence quotient exceeding seventy on a reliable standardized measure of intelligence is presumptive evidence that the defendant does not have significant subaverage general intellectual functioning."); Wiley v. Epps, 668 F. Supp. 2d 848, 897 (N.D. Miss. 2009) ("In Mississippi, [an] IQ of 75 is the 'cutoff score' for assessing subaverage intellectual functioning for purposes of diagnosing mental retardation.").

mental retardation.  Id.

Hill's Eighth Amendment right is inextricably bound up in his ability to comply with the state's procedural and substantive requirements for determining mental retardation.  Cf. Walker v. True, 399 F.3d 315, 319-20 (4th Cir. 2005) ("While Walker's claim ultimately derives from his rights under the Eighth Amendment, whether he is mentally retarded is governed by Virginia law."). Atkins's substantive Eighth Amendment right is bestowed on only an individual who comports with the state processes that determine who is mentally retarded. Given that Hill failed to meet Georgia's reasonable-doubt standard, he failed to demonstrate that he is mentally retarded, and therefore, failed to prove an impending Eighth Amendment violation.  Because Hill has not established mental retardation beyond a reasonable doubt, a denial of Hill's petition does not result in the execution of a mentally retarded individual under Georgia law.[20]

In any event, because Atkins never said, or even hinted at (much less held), what procedures are or are not "appropriate" for implementing the prohibition

---

[20]The majority opinion's facile argument that the Eighth Amendment requires a preponderance of the evidence standard for mental retardation claims because a more stringent standard of proof "necessarily will result in the deaths of mentally retarded individuals" ignores not only that a risk of error exists with any burden of proof, but also that Atkins did not purport to establish a nationwide procedural or substantive standard for determining mental retardation. See Atkins, 536 U.S. at 317, 122 S. Ct. at 2250 (noting "serious disagreement . . . in determining which offenders are in fact retarded," and that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus").

<u>Atkins</u> recognized, <u>Atkins</u> <u>a fortiori</u> does not provide "clearly established" federal law for Hill's claims. To accept the majority opinion's argument would require us to run far afield from <u>Atkins</u>'s actual language and to abandon the deference AEDPA demands. And the United States Supreme Court just this year has twice re-emphasized the constraints AEDPA imposes on federal circuit courts.

The majority opinion focuses on Georgia's burden-of-proof procedure and ignores every other procedural protection afforded under Georgia's statute. Looking solely to one aspect of Georgia's procedures, without placing them in context, is inconsistent with <u>Ford</u>, where the Supreme Court evaluated Florida's process <u>as a whole</u>.[21]

Georgia's process, when evaluated <u>as a whole</u>, contains substantial procedural protections. Georgia law guarantees Hill the rights: (1) to a full and fair plenary trial on his mental retardation claim, as part of the guilt phase of his capital

---

[21]Florida law directed the Governor to appoint a commission of three psychiatrists to simultaneously examine the defendant and then to provide an <u>ex parte</u> report to the Governor. The Supreme Court found that Florida's process suffered from a number of grievous flaws: (1) defendants were not included at all in the "truth-seeking process"; (2) defendants were prohibited from submitting material to the fact-finder; (3) there was no opportunity for the defendant to challenge or impeach state-appointed experts; (4) the psychiatric examination of defendant Ford was only 30 minutes long; and (5) the insanity evaluation process was housed exclusively within the province of the executive branch, which gave the Governor the final say over fact-findings needed to trigger the constitutional protection. See <u>Ford</u>, 477 U.S. at 416, 106 S. Ct. at 2605 ("In no other circumstance of which we are aware is the vindication of a constitutional right entrusted to the unreviewable discretion of an administrative tribunal.") (plurality opinion).

trial; (2) to present his own experts and all other relevant evidence; (3) to cross-examine and impeach the state's experts; (4) to have a neutral factfinder (the jury, if Hill had elected to have mental retardation decided during the guilt phase, and a judge if otherwise) decide the issue; (5) to orally argue before the factfinder; and (6) to appeal any mental retardation determination. Within the bounds of evidentiary admissibility, there is virtually no limit to the evidence a Georgia defendant can present in support of his mental retardation claim. Thus, the reasonable-doubt standard is but one aspect of a detailed and comprehensive fact-finding process under Georgia law.[22] This is not to say what the ultimate outcome of the constitutional issue in this case should be, but only serves to illustrate further how <u>Atkins</u> did not decide the burden-of-proof question here.

As did the <u>Atkins</u> Court, Justice Powell's concurring opinion in <u>Ford</u> made clear its refusal to clearly establish any precise limit <u>on a state's fact-finding procedures</u> for determining the insanity bar to execution aside from a few core due process rights. See <u>Ford</u>, 477 U.S. at 427, 106 S. Ct. at 2610 (Powell, J., concurring

_____

[22]If anything, Georgia's procedural protections go above and beyond the protections required by <u>Ford</u>. For starters, the plurality opinion in <u>Ford</u> made clear that it did not "suggest that only a full trial on the issue of sanity will suffice to protect the federal interests." <u>Id.</u> Here, Georgia provides for a full trial on the issue of mental retardation, complete with the age-old, common law reasonable-doubt standard. Furthermore, Justice Powell's decision to join the four-vote plurality in <u>Ford</u> was based not on plucking out one piece of Florida's procedure, but rather on his assessment that all of "the procedures followed by Florida in this case do not comport <u>with basic fairness</u>." <u>Id.</u> at 399, 106 S. Ct. at 2609 (emphasis added).

50

in part and concurring in the judgment) ("The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake.") (emphasis added).

Atkins left the states substantial leeway. And Georgia has exercised that leeway by setting the IQ level at 70 (lower than some states, which set it at 75), and by determining that the risk of error due to malingering or other factors is substantial and that there is a need for a robust burden of proof. This is exemplified in Hill's case where Hill's initial expert (clinical psychologist William Dickinson) initially testified Hill had an IQ of 77 and was not mentally retarded, and Hill never claimed mental retardation at trial, on direct appeal, or in his first state habeas petition. The habeas record also documents Hill's (1) extensive work history and ability to function well; (2) disciplined savings plans to purchase cars and motorcycles; (3) military service; and (4) active social life. This is not to diminish the critical importance of the Atkins right not to be executed if mentally retarded. It is only to say that the Georgia Supreme Court's decision was not contrary to "clearly established" federal law.

# IV. CONCLUSION

Even if the Georgia Supreme Court's decision is considered incorrect or unwise by a federal judge, and even if the State of Georgia has inappropriately struck the balance between two competing interests in § 17-7-131(c)(3), AEDPA precludes federal circuit courts from imposing their will, invalidating a state statute, § 17-7-131(c)(3), as unconstitutional, and reversing the Georgia Supreme Court's decision in the absence of "clearly established" federal law, which the United States Supreme Court admonishes is a holding of that Court. There is no United States Supreme Court case suggesting, much less holding, that a reasonable-doubt burden of proof for claims of mental retardation violates the Eighth Amendment.[23] Atkins did not answer that question. Whether I agree with the Georgia Supreme Court or not, AEDPA requires that this federal court affirm the denial of Hill's § 2254 petition. Indeed, I need not decide the constitutional question as to Georgia's burden of proof statute, but say only that the United States Supreme Court has not

---

[23]There is no evidence in this record to support the proposition that the reasonable-doubt burden triggers an unacceptably high error rate for a capital case. Whether the burden of proof scheme will result in an unacceptably high error rate is, in part, an empirical question that we are ill-equipped to measure in the first instance. There is no data on this question in this record.

The majority is left to assert in note 8, without any support, that a defendant will rarely, if ever, be able to prove he is mentally retarded beyond a reasonable doubt because experts will simply disagree. Experts in criminal cases have disagreed for years on numerous matters, such as on ballistics, insanity, DNA analysis, serology, pathology, fingerprints, handwriting, hair and fiber analysis, the reliability of eyewitness testimony, etc. But that has never invalidated a burden-of-proof procedural standard. At least in this record, there is no data to support the majority's position.

decided it either and thus I must sustain the Georgia Supreme Court's decision.

Accordingly, I must dissent from the majority's invalidating a state statute as

unconstitutional, effectively reversing the Georgia Supreme Court's decision, and

refusing to follow AEDPA.